KELLY, DIRECTOR, ET AL. *v.* WASHINGTON EX REL.
FOSS CO.

No. 2.   Argued March 9, 1937.   Reargued October 11, 12, 1937.—
Decided November 8, 1937.

On reargument, *Mr. E. P. Donnelly* for petitioners, and *Mr. Glenn J. Fairbrook* for respondents. *Assistant Solicitor General Bell*, with whom *Solicitor General Reed* and *Messrs. Sam E. Whitaker* and *J. Frank Staley* were on the brief of the United States, as *amicus curiae*, supporting the decision of the state court.

On original argument, *Messrs. W. A. Toner* and *Daniel Baker* for petitioners, and *Mr. Glenn J. Fairbrook* for respondents.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Respondents, owners of motor-driven tugs, sought a writ of prohibition to prevent the enforcement of provi-

sions of c. 200 of the Washington Laws of 1907 (Rem. Rev. Stat., §§ 9843 *et seq.*) relating to the inspection and regulation of vessels. The Supreme Court of the State directed judgment for respondents, holding the statute invalid "if applied to the navigable waters over which the Federal Government has control." 186 Wash. 589, 596. We granted certiorari. 299 U. S. 539. After hearing, we ordered reargument and requested the Attorney General of the United States to present the views of the Government upon the question whether the state Act or the action of the officers of the State thereunder conflicts with the authority of the United States or with the action of its officers under the Acts of Congress. The case has been reargued accordingly and the views of the Government have been presented both orally and upon brief in support of the decision of the state court.

The material facts, as set forth in the opinion of the state court, are that respondents own and operate one hundred and thirty-nine motor-driven tugs of which one hundred and eleven are less than sixty-five feet in length. Some of these tugs are registered and the remainder are enrolled and licensed under federal laws. For the most part these tugs are employed in intrastate commerce, but some tow to and from British Columbia ports or across the Columbia River or from other ports in Washington to ports in Oregon. Practically all these tugs are capable of engaging in interstate or foreign commerce and will do so if and when opportunity offers. Some of the larger tugs have towed and will tow to California ports. The main business, however, of most of the tugs is confined to moving vessels engaged in interstate and foreign commerce and other work in and about the harbors where they are stationed. 186 Wash. p. 590.

Respondents' complaint challenged the validity of a large number of requirements of the state Act which it was alleged the state authorities sought to enforce (186

Wash. p. 591), but these authorities by their answer and in the argument at bar disclaim an intention to enforce any of the state regulations which conflict with those established under the laws of the United States.

*First.* The first question is whether the state legislation as applied to respondents' motor-driven tugs is in all respects in conflict with express provisions of the federal laws and regulations. Wherever such conflict exists, the state legislation must fall. *Gibbons* v. *Ogden,* 9 Wheat. 1, 210.

Chapter 200 of the Washington Laws of 1907 is described by the state court as "a comprehensive and complete code for the inspection and regulation of every vessel operated by machinery which is not subject to inspection under the laws of the United States." Rem. Rev. Stat., § 9844; 186 Wash. p. 590. It cannot be doubted that the power of Congress over interstate and foreign commerce embraces the authority to make regulations for respondents' tugs. *Foster* v. *Davenport,* 22 How. 244; *Moran* v. *New Orleans,* 112 U. S. 69; *Harman* v. *Chicago,* 147 U. S. 396. Has Congress exercised that authority and, if so, to what extent?

The federal acts and regulations with respect to vessels on the navigable waters of the United States are elaborate. They were well described in the argument of the Assistant Solicitor General as a maze of regulation. Provisions with respect to steam vessels are extremely detailed. 46 U. S. C., c. 14, §§ 361 *et seq.* Provisions as to motor-driven vessels are far less comprehensive and establish only a limited regulation. By § 4426 of the Revised Statutes, as amended by the Act of March 3, 1905, c. 1457, 33 Stat. 1029, 1030, and by the Act of May 16, 1906, c. 2460, 34 Stat. 193, 194, it was provided that all vessels "above fifteen gross tons carrying freight or passengers for hire, but not engaged in fishing as a regular business, propelled by gas, fluid,

naphtha, or electric motors," should be subject to the provisions of the statute relating to the inspection of hulls and boilers and requiring engineers and pilots. These vessels were also required to carry life preservers for passengers and, while carrying passengers, to be in charge of a person duly licensed by the federal local board. 46 U. S. C. 404. It does not appear that respondents' motor-driven tugs are within the class of vessels which carry freight or passengers for hire.

In 1910, Congress enacted the Motor Boat Act. 36 Stat. 462. While this statute is applicable to respondents' tugs, so far as it goes, its scope is restricted. Section 1 defines the word "motor boat" as including "every vessel propelled by machinery and not more than sixty-five feet in length except tugboats and towboats propelled by steam." There follows in that section a proviso that the engine, boiler or other operating machinery shall be subject to inspection by the local inspectors of steam vessels, and to the approval of the design thereof, where the vessels "are more than forty feet in length and are propelled by machinery driven by steam." Section 2 divides the motor boats which are subject to the Act into three classes; (1) those less than twenty-six feet in length; (2) those twenty-six feet or over and less than forty feet in length; (3) those forty feet or over and not more than sixty-five feet in length. Section 3 then provides for the carrying of lights by motor boats of the respective classes. Section 4 relates to whistles, fog horns and bells. Sections 5 and 6 provide that motor boats subject to the Act, and also motor boats more than sixty-five feet in length, shall carry life preservers or life belts or similar devices and fire extinguishing equipment. Section 5 requires that all motor boats carrying passengers for hire shall be in charge of a person duly licensed by the federal local board of Inspectors, and has the proviso that motor boats shall not be required to carry

licensed officers except as required by the Motor Boat Act. 46 U. S. C. 511–518. Under the federal regulations, motor boats are required to have on board two copies of the pilot rules to be observed by them, with copies of the departmental circular.

As documented vessels of the United States, motor boats must be marked in a specified manner with their names and home ports. 46 U. S. C. 46. All vessels, regardless of tonnage, size, or manner of propulsion, and whether or not carrying freight or passengers for hire (other than public vessels of the United States not engaged in commercial service), which have on board "any inflammable or combustible liquid cargo in bulk," are to be "considered steam vessels" and are made subject to the provisions of the statutes relating to such vessels. This provision does not apply to inflammable or combustible liquid for use as fuel or stores. Act of June 23, 1936, c. 729, 49 Stat. 1889; 46 U. S. C. 391a. Vessels transporting explosives or like dangerous cargo are subject to inspection to determine that such cargo may be carried with safety, and appropriate permit for that purpose is required. Act of August 26, 1935, c. 697, 49 Stat. 868, 46 U. S. C. 178. "Load lines" are established for merchant vessels of one hundred and fifty gross tons or over proceeding on a "coastwise voyage by sea," as defined, that is, outside the line dividing inland waters from the high seas. Act of August 27, 1935, c. 747, 49 Stat. 888, 46 U. S. C. 88. Compare International Load Line Convention of July 5, 1930, 47 Stat. 2229. It appears from statements in the record and in argument, which we do not understand to be challenged, that there are not more than three of respondents' motor tugs, here involved, which exceed one hundred and fifty tons gross.

The limited application of the provisions of the federal laws and regulations to vessels propelled by internal combustion engines was recently and definitely brought to

the attention of Congress. The report of the Bureau of Navigation and Steamboat Inspection showed that there were many large vessels of this class.[1] The Committee on Merchant Marine and Fisheries of the House of Representatives found that this situation was due to the fact "that when the steamboat-inspection laws were passed, internal-combustion-engine laws were unknown, with the result that many of the existing laws apply to steam vessels and under the opinion of the law officers of the department, do not apply to vessels operated by machinery other than by steam." The Committee added that "it was very doubtful whether under existing law lifeboats could be required on these motor vessels." [2] To meet that situation Congress has provided that existing laws covering the inspections of steam vessels shall be applicable "to seagoing vessels of three hundred gross tons and over propelled in whole or in part by internal-combustion engines" to such extent as may be required by the regulations of the Board of Supervising Inspectors of Steam Vessels with the approval of the Secretary of Commerce. Act of June 20, 1936, c. 628, 49 Stat. 1544, 46 U. S. C. 367. Even as thus limited, the Act expressly excepts vessels engaged "in fishing, oystering, clamming, crabbing, or any other branch of the fishery or kelp or sponge industry." It is manifest that Congress carefully considered the application of existing laws and decided to what extent its field of regulation should be widened.[3] Congress decided to extend its regulation as to motor-driven vessels only to those of the specified class.

---

[1] Report (June 25, 1935) of the Committee on Merchant Marine and Fisheries of the House of Representatives on "Inspection of Motor Vessels." H. R. Rep. No. 1321, 74th Cong., 1st sess. Reference was made to the situation as described by the Assistant Director of the Bureau of Navigation and Steamboat Inspection as follows:

"We have at the present time vessels that are operated by internal-

8

We find the conclusion inescapable that, apart from the particular requirements in other respects, there is no provision of the federal laws and regulations for the inspection of the hull and machinery of respondents' motor-driven tugs in order to insure safety or determine seaworthiness, where these tugs respectively do not carry freight or passengers for hire, or do not have on board any inflammable or combustible liquid cargo in bulk, or do not transport explosives or like dangerous cargo, or are not seagoing vessels of three hundred gross tons or over, or, with respect to requirements as to load lines, are under one hundred and fifty gross tons. It follows that inspection of the hull and machinery of these tugs by state authorities in order to insure safety and determine seaworthiness is not in conflict with any express provision of the federal laws and regulations. The testimony in the record shows that those laws and regulations are administered in accordance with this view.

combustion engines, of tonnages exceeding 100, there are 772 vessels of 819,935 gross tons that would come under the provision of this law [the proposed bill].

"For instance, we have in the class from 5,000 to 7,500 tons 29 vessels, with a total tonnage of· 179,556; and over 7,500 tons we have 33 vessels, with a total tonnage of 300,292.

"Those large vessels at the present time are subject to only a very limited inspection—that is, the inspection of the hulls and boilers, and are required under the law to carry a licensed engineer and a licensed pilot. The provisions of section 4472 that provides for protection against fire do not apply to our 7,500-ton vessels that are in the trans-Atlantic trade. They are not required under the law to carry a single lifeboat. There are many other provisions of the steamboat inspection laws that are of the utmost importance to safety of life that do not apply to these large transoceanic vessels. As a matter of fact, we are inspecting those vessels at the present time, but it is only because the owners of the ships accept such inspection. It is not a matter of law."

[2] H. R. Rep. No. 2505, 74th Cong., 2d sess.
[3] *Id.* ·

*Second.* The next question is whether the federal statutes are to be construed as implying a prohibition of inspection by state authorities of hull and machinery to insure safety and determine seaworthiness in the case of vessels which in this respect lie outside the federal requirements.

The state court took the view that Congress had occupied the field and that no room was left for state action in relation to vessels plying on navigable waters within the control of the federal government. 186 Wash. pp. 593, 596. And this is the argument pressed by respondents and the Solicitor General.

This argument, invoking a familiar principle, would be unnecessary and inapposite if there were a direct conflict with an express regulation of Congress acting within its province. The argument presupposes the absence of a conflict of that character. The argument is also unnecessary and inapposite if the subject is one demanding uniformity of regulation so that state action is altogether inadmissible in the absence of federal action. In that class of cases the Constitution itself occupies the field even if there is no federal legislation. The argument is appropriately addressed to those cases where States may act in the absence of federal action but where there has been federal action governing the same subject. *Prigg* v. *Pennsylvania,* 16 Pet. 539, 617, 618; *Northern Pacific Ry. Co.* v. *Washington,* 222 U. S. 370, 379; *Erie R. Co.* v. *New York,* 233 U. S. 671, 681, 682; *Southern Ry. Co.* v. *Railroad Commission,* 236 U. S. 439, 446, 447; *Oregon-Washington R. & N. Co.* v. *Washington,* 270 U. S. 87, 101, 102; *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605, 612, 613; *Gilvary* v. *Cuyahoga Valley Ry. Co.,* 292 U. S. 57, 60, 61.

Under our constitutional system, there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their ter-

ritorial jurisdiction although interstate commerce may be affected. *Minnesota Rate Cases,* 230 U. S. 352, 402. States are thus enabled to deal with local exigencies and to exert in the absence of conflict with federal legislation an essential protective power. And when Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced. The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so "direct and positive" that the two acts cannot "be reconciled or consistently stand together." *Sinnot* v. *Davenport,* 22 How. 227, 243; *Missouri, K. & T. Ry. Co.* v. *Haber,* 169 U. S. 613, 623, 624; *Reid* v. *Colorado,* 187 U. S. 137, 148; *Crossman* v. *Lurman,* 192 U. S. 189, 199, 200; *Asbell* v. *Kansas,* 209 U. S. 251, 257, 258; *Missouri Pacific Ry. Co.* v. *Larabee Mills,* 211 U. S. 612, 623; *Savage* v. *Jones,* 225 U. S. 501, 533; *Atlantic Coast Line* v. *Georgia,* 234 U. S. 280, 293, 294; *Carey* v. *South Dakota,* 250 U. S. 118, 122; *Atchison, T. & S. F. Ry. Co.* v. *Railroad Commission,* 283 U. S. 380, 392, 393; *Mintz* v. *Baldwin,* 289 U. S. 346, 350. *Gilvary* v. *Cuyahoga Valley Ry. Co., supra.*

A few illustrations will suffice. In *Reid* v. *Colorado, supra,* the question arose with respect to a statute of Colorado aimed at the prevention of the introduction into the State of diseased animals. One who had been convicted of its violation contended that the subject of the transportation of cattle by one State to another had been so far covered by the federal statute, known as the Animal Industry Act (23 Stat. 31), that no enactment by the State upon that subject was permissible. While the

congressional act did deal with the subject of the driving or transporting of diseased livestock from one State into another, Congress had gone no further than to make it an offense against the United States for one *knowingly* to take or send from one State to another livestock affected with infectious or communicable disease. The Court concluded that the state statute, requiring a certificate that the cattle were free from disease, irrespective of the shipper's knowledge of the actual condition of the cattle, did not cover the same ground as the Act of Congress and was not inconsistent with it. *Id.*, pp. 149, 150. The principle was thus emphatically stated: "It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said—and the principle has often been reaffirmed—that, 'in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together'." [p. 148.]

In *Savage* v. *Jones, supra,* the Court held that a statute of Indiana regulating the sale, and requiring a statement of the formula of ingredients, of concentrated commercial food for stock was not repugnant to the federal Food and Drugs Act of 1906 (34 Stat. 768). A citizen of Minnesota sought to restrain the enforcement of the Indiana statute with respect to stock food sold and transported in interstate commerce. The federal Act dealt with the subject of adulterated and misbranded foods and defined misbranding. It covered any false or misleading statements as to ingredients but did not require a disclosure of the ingredients. The state statute dealt with that omitted matter. We found that the state requirements could be sustained without impairing the operation of the federal Act as to the matters with which that Act dealt. We

said: "But the intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State." [p. 533.]

In *Mintz* v. *Baldwin, supra,* the question related to the validity of the requirement of a New York statute that cattle brought into that State for dairy or breeding purposes, and also the herds from which they came, should be certified to be free from Bang's disease by the chief sanitary official of the State of origin. One of the contentions was that the statute conflicted with the federal statute known as the Cattle Contagious Disease Act of 1903. 32 Stat. 791. To enable the Secretary of Agriculture to prevent the spread of disease among cattle and other livestock, he was authorized to establish regulations concerning interstate transportation from any place where he had reason to believe that diseases existed. When an inspector of the Bureau of Animal Industry certified that he had inspected cattle and had found them free from communicable disease, they were permitted to be transported "without further inspection or the exaction of fees of any kind except such as may at any time be ordered or exacted by the Secretary of Agriculture." [p. 351.] But the express exclusion of state inspection extended only to cases where there had been federal inspection and a certificate issued. Accordingly we held that it could not be extended to the case before the Court where the cattle had not been inspected and certified by federal authority. We said: "The purpose of Congress to supersede or exclude state action against the ravages of the disease is not lightly to be inferred. The intention so to do must definitely and clearly appear." [p. 350.]

The application of the principle is strongly fortified where the State exercises its power to protect the lives and the health of its people. But the principle is not limited to cases of that description. It extends to exertions of state power directed to more general purposes. Thus it was applied in sustaining the order of a state commission requiring interstate carriers to construct a union passenger station as against the contention that Congress had occupied the field—in view of the broad sweep of the Act conferring authority upon the Interstate Commission to deal with the operation of interstate railroads—as it was found that Congress had not authorized the Commission to meet the public need in the particular matter in question. *Atchison, T. & S. F. Ry. Co.* v. *Railroad Commission, supra,* p. 391.

In the instant case, in relation to the inspection of the hull and machinery of respondents' tugs, the state law touches that which the federal laws and regulations have left untouched. There is plainly no inconsistency with the federal provisions. It would hardly be asserted that when Congress set up its elaborate regulations as to steam vessels, it deprived the State of the exercise of its protective power as to vessels not propelled by steam. The fact that the federal regulations were numerous and elaborate does not extend them beyond the boundary they established. When Congress took up the regulation of vessels otherwise propelled it applied its requirements to vessels of a described tonnage which carried freight or passengers for hire. When Congress a few years later passed the Motor Boat Act, it did not attempt to deal with the subject comprehensively but laid down rules in a few particulars of a definitely restricted range. And when, in 1936, Congress again addressed itself to the subject, it did not purport to occupy the entire field but confined its regulation to seagoing vessels of three hundred gross tons and over. It would be difficult to find a

series of statutes in which the intention of Congress to circumscribe its regulation and to occupy a field limited by definite description is more clearly manifested.

When the State is seeking to prevent the operation of unsafe and unseaworthy vessels in going to and from its ports, it is exercising a protective power akin to that which enables the State to exclude diseased persons, animals and plants. These are not proper subjects of commerce, and an unsafe and unseaworthy vessel is not a proper instrumentality of commerce. When the State is seeking to protect a vital interest, we have always been slow to find that the inaction of Congress has shorn the State of the power which it would otherwise possess. And we are unable to conclude that so far as concerns the inspection of the hull and machinery of these vessels of respondents in order to insure safety and seaworthiness, the federal laws and regulations, which as we have found are not expressly applicable, carry any implied prohibition of state action.

Much is made of the fact that the state law remained unenforced for a long period. But it did not become inoperative for that reason. Where the state police power exists, it is not lost by non-exercise but remains to be exerted as local exigencies may demand.

*Third.* The remaining question is whether the state law must fall in its entirety, not because of inconsistency with federal action, but because the subject is one as to which uniformity of regulation is required and hence, whether or not Congress has acted, the State is without authority. *Cooley* v. *Board of Wardens,* 12 How. 299, 319; *Minnesota Rate Cases,* 230 U. S. 352, 399, 400.

The state law is a comprehensive code. While it excepts vessels which are subject to inspection under the laws of the United States, it has provisions which may be deemed to fall within the class of regulations which Congress alone can provide. For example, Congress may

establish standards and designs for the structure and equipment of vessels, and may prescribe rules for their operation, which could not properly be left to the diverse action of the States. The State of Washington might prescribe standards, designs, equipment and rules of one sort, Oregon another, California another, and so on. But it does not follow that in all respects the state Act must fail.

We have found that in relation to the inspection of the hull and machinery of these tugs, in order to insure safety and seaworthiness, there is a field in which the state law could operate without coming into conflict with present federal laws. Is that a subject which necessarily and in all aspects requires uniformity of regulation and as to which the State cannot act at all, although Congress has not acted? We hold that it is not. A vessel which is actually unsafe and unseaworthy in the primary and commonly understood sense is not within the protection of that principle. The State may treat it as it may treat a diseased animal or unwholesome food. In such a matter, the State may protect its people without waiting for federal action providing the state action does not come into conflict with federal rules. If, however, the State goes farther and attempts to impose particular standards as to structure, design, equipment and operation which in the judgment of its authorities may be desirable but pass beyond what is plainly essential to safety and seaworthiness, the State will encounter the principle that such requirements, if imposed at all, must be through the action of Congress which can establish a uniform rule. Whether the State in a particular matter goes too far must be left to be determined when the precise question arises.

We have mentioned the inspection of hull and machinery of respondents' vessels in order to insure safety and seaworthiness. There may be other requirements of the

state Act which also lie outside the bounds of the federal action thus far taken and as to which uniformity of regulation is not needed. That question cannot be satisfactorily determined on this record and must also remain for decision as it may be presented in the future in connection with some particular action taken by the state authorities. Our conclusion is that the state Act has a permissible field of operation in relation to respondents' tugs and that the state court was in error in holding the Act completely unenforceable in deference to federal law. The judgment of the state court to that effect is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*