122 So.2d 280

STANDARD DREDGING CORPORATION

v.

STATE of Alabama.

3 Div. 765.

Supreme Court of Alabama.

June 30, 1960.

23

Martin & Blakey, Birmingham, Frank H. Hawthorne, Montgomery, Deutsch, Kerrigan & Stiles, Robt. E. Leake, Jr., and René H. Himel, Jr., New Orleans, La., for appellant.

John Patterson, Atty. Gen., Willard W. Livingston and Wm. H. Burton, Asst. Attys. Gen., for appellee.

GOODWYN, Justice.

This is an appeal by the Standard Dredging Corporation (herein referred to as Standard) from a decree of the circuit court of Montgomery County, in equity, sustaining an assessment made against it by the State for a contractor's license tax prescribed by § 496, Tit. 51, Code 1940. Our problem is to determine whether such license tax may validly be levied against Standard as a consequence of its acceptance and performance of a contract with the United States for maintenance dredging of the navigation channel in Mobile Bay.

Except for certain exhibits, and the testimony of one witness for the State (H. S. Phifer, Chief of the License Tax Division of the Department of Revenue) taken orally before the trial court, the facts were stipulated as follows:

"1—Standard Dredging Corporation, which is engaged in business as a dredging contractor, is a corporation duly organized and existing under and by virtue of the laws of the State of

New Jersey. Its principal office is maintained in New York City. In addition, the corporation maintains division offices in Los Angeles, California (West Coast Division), and New Orleans, Louisiana (Southern Division). A district office also is located in Galveston, Texas.

"2—The corporation's Southern Division, whose operations are supervised, directed and controlled from its division office at New Orleans, Louisiana, operates three hydraulic dredges (among which is the Dredge Diesel), with auxiliary vessels and attendant plant (among which are the Tugs *Peter* and *Maryel*), in the States of Tennessee, Arkansas, Texas, Louisiana, Mississippi, Alabama and Florida.

"3—During the entire period from October 1, 1952 through September 30, 1953 (the period for which the tax at issue herein was levied) said corporation was duly qualified to do business in the State of Alabama, paid its franchise taxes with respect to such period, and was duly licensed by the State Licensing Board of General Contractors to practice general contracting in Alabama.

"4—On or about April 29, 1953, Standard Dredging Corporation contracted with the United States of America for maintenance dredging of the navigation channel in Mobile Bay, Alabama. The corporation's bid for such contract was prepared at its Southern Division office at New Orleans, Louisiana, and was submitted to the United States Corps of Engineers at Mobile, Alabama. Acceptance of said bid was by telegraphic advice from the Corps of Engineers at Mobile to the corporation at New Orleans. The formal contract was executed by the Corps of Engineers at Mobile, and by the corporation at New York. Said contract was the only contract accepted for performance, or performed, in Alabama by Standard Dredging Corporation during the period in question.

"5—The work under said contract consisted of dredging silt from the bottom of the channel and was done between Beacons 24 and 38 in Mobile Bay, as is shown on the maps attached hereto as Exhibits, P 5 and P 6 which was necessary to maintain prescribed navigational depths, and called for the removal of an estimated 3,000,000 cubic yards of material at a unit price of 5.14¢ per cubic yard, or an estimated total price of $154,000. The work began on May 8, 1953 and was completed on June 15, 1953. Only 2,828,312 cubic yards of material were actually dredged, and the total actual contract price was $145,375.34. Prior to, during, and following performance of said work, said navigation channel was used extensively in interstate and foreign commerce.

"6—Work under said contract was subject to the direction and supervision, on behalf of the United States, of the United States Corps of Engineers, which has the responsibility of maintaining, repairing and improving the navigable harbors and waterways of the United States including Mobile Bay.

"7—Performance of said contract was directed and supervised, · on behalf of Standard Dredging Corporation, from its division office in New Orleans, Louisiana, where the planning, engineering and administrative work in connection with, and executive and accounting control of, said contract also was done. Standard Dredging Corporation maintained no office or place of business in the State of Alabama during the period in question.

"8—Standard Dredging Corporation executed the work under said contract through the use of its hydraulic suction dredge *Diesel,* her auxiliary vessels, the Tugs *Peter* and *Maryel,* and

attendant plant. These vessels were brought to Mobile Bay from Texas, via the Gulf Intracoastal Waterway, on May 7, 1953. At all times while performing said work these vessels were afloat in Mobile Bay, navigating under their own power (the dredge sometimes also being assisted by her auxiliary tugs for facility of movement). On June 17, 1953, after completing the work, said vessels and plant, departed Mobile Bay for the Port of New Orleans, Louisiana via the Gulf Intracoastal Waterway.

"9—The Dredge *Diesel* and her auxiliary vessels, the Tugs *Peter* and *Maryel,* each is of more than twenty tons burden, and each is, and at all times herein mentioned was, enrolled as a vessel of the United States, and licensed by the Bureau of Marine Inspection and Navigation of the Department of Commerce of the United States to engage in the maritime coasting trade. Photostatic copies of the coasting licenses of said vessels, marked exhibits P 1, P 2, and P 3, respectively, are annexed hereto and made part hereof as fully as though set forth *in extenso* herein. During the taxable period in question, said vessels operated on the navigable waters of the United States within the States of Texas, Louisiana, Mississippi, Alabama and Florida.

"10—During the period in question, the only property of Standard Dredging Corporation within the State of Alabama was the Dredge *Diesel,* her auxiliary vessels and attendant plant necessary for the execution of the subject contract. The vessels' crews lived aboard the dredge, in quarters provided for that purpose."

There is no dispute that Mobile Bay, where the dredging work was done, is a part of the territorial waters of the State of Alabama.

The position taken by Standard is (I) that the license tax imposed by § 496, Tit.

51, Code 1940, supra, is on the privilege of accepting or making contracts and, as such, may not be exacted "for the privilege of accepting or making a contract with the United States of America under the circumstances" of this case.

Alternatively, it is insisted that, if it should be held that the license tax is directed against the privilege of performing work under contract and not for contracting therefor, the tax as imposed against Standard's activities here involved is invalid (II) "as a direct burden on interstate commerce", and (III) "as an impairment of the exclusive admiralty and maritime jurisdiction of the Congress of the United States, and of the Federal maritime coasting licenses of appellant's vessels."

(I)

We are unable to agree with Standard's insistence that § 496 "purports to levy the tax on the privilege of 'accepting' contracts," and only on such privilege. Accordingly, there is no occasion to discuss the further insistence that the tax "may not be imposed on the privilege of contracting with the United States of America."

Section 496, to the extent here pertinent, provides as follows:

"§ 496. Construction companies or contractors.—Any person, firm or corporation * * * who shall accept an order for or contract to excavate earth, rock or other material for foundations or any other purpose, * * * shall be deemed a contractor. Every contractor shall procure from the probate judge of the county in which he has his principal office a license *to carry on the business of a contractor,* provided that if such contractor has no such office in this state, then he shall procure such license from the probate judge of the county *where the contract is to be performed.* Every such contractor shall pay a license to be ascertained in the following manner: If the gross amount of all orders or contracts accepted

aggregate five thousand dollars and not exceeding ten thousand dollars, he shall pay the sum of ten dollars; * * * if *the amount of such orders or contracts* exceeds two hundred thousand dollars, two hundred and fifty dollars; and when such contractor shall have obtained a license for any year for which he has paid a license tax of less than the maximum above prescribed he shall not accept any contract or contracts during such year, the aggregate amount of which exceeds the maximum amount for which his license was obtained, unless and until he shall have paid such additional sum as will make the total license tax paid by him for that year sufficient to cover the aggregate amount of such contract or contracts as prescribed above; and unless he pays such additional sum he shall be deemed to be acting without a license. The payment of the license in one county in the state, as evidenced by the license or official certificate of the probate judge, shall be sufficient." [Emphasis supplied.]

It is to be noted that § 496 was amended on September 17, 1953 (Act No. 749, Acts 1953, Vol. II, p. 1012), after the license here involved became due and payable. The amendment added the following phrase after the word "ascertained" in the third sentence, viz.: "on the basis of the gross amount of all orders or contracts accepted, exclusive of orders or contracts pertaining to state or county road and bridge projects." The amendment is not applicable here.

 We think a fair and reasonable interpretation of § 496, when considered in connection with related statutes and the long-standing administrative interpretation, is that it requires a license on the performance of a contract and not just on its acceptance. The all-prevailing rule is that "a statute is to be construed in accordance with its real intent and meaning, and not so strictly as to defeat the legislative purpose." Alabama-Georgia Syrup

Co. v. State, 253 Ala. 49, 52, 42 So.2d 796, 798. As said in Touart v. American Cyanamid Co., 250 Ala. 551, 555–556, 35 So.2d 484, 487:

> "* * * We fully recognize the strength of the ingenious and plausible argument of counsel for appellee that the Court is not justified in taking other than the literal language of the statute. But there are instances where this becomes necessary in order to carry out the true legislative intent, which after all is the purpose of the Court. * * * 'A literal interpretation will not be adopted when it would defeat the purpose of a statute, if any other reasonable construction can be given to the words.' * * *"

If the license is on the "acceptance" of a contract only, as insisted by Standard, then anyone contemplating the acceptance of a contract necessarily would have to acquire a license in advance of actual acceptance in order to avoid the penalty prescribed by § 834, Tit. 51, Code 1940. That would be an anomalous situation. Before a contract is formally entered into there can be no assurance that there will ever be a contract. Section 834 makes it unlawful for anyone to "do any act for which a license is required * * * without having first paid for and taken out a license therefor * * *." Section 450, Tit. 51, also provides that a license must first be procured before engaging in any activity or exercising any privilege requiring a license.

Also, if § 496 should be interpreted as placing a license only on the privilege of "accepting" a contract, the result would be to ascribe to the legislature an intent to encourage the making of contracts outside the state, although to be performed entirely within the state. In other words, parties contracting within the state for work to be done here would be disadvantaged, certainly to the extent of the cost of the license, in competing with nonresident contracting parties. We do not

think the legislature intended any such unfair and discriminatory result. Rather, it seems to us, the intention was to require payment of a contractor's license after "acceptance" of a contract, whether that event takes place in this state or elsewhere, but prior to performance of the contract in this state. In other words, the requirement is that a license be paid in advance of the performance of a contract, not before its acceptance, the effect being that the license is on the privilege of performing a contract in this state. It is immaterial whether the contract is accepted or agreed to in this state or elsewhere. For instance, the acceptance of a contract in this state, which is not to be performed here, would not call for a license. Such has been the uniform interpretation and application of the statute by the State Department of Revenue for many years, according to the uncontradicted testimony. See O'Pry Heating & Plumbing Co. v. State, 241 Ala. 507, 513, 3 So.2d 316, 321, where, in discussing what is now § 496, it was said:

"If the schedule is to apply only to an acceptance of a contract, what about one which is accepted outside of the State, with no power of the State then to tax it, but it is to be and is later performed in whole or in part in Alabama?

"In line with the conclusion manifest in Sollitt & Sons Const. Co. v. Commonwealth, supra [161 Va. 854, 172 S.E. 290, 91 A.L.R. 774], we perhaps would say that the subsequent performance, in whole or in part, in Alabama would unify the acceptance and performance as one Alabama transaction so as to bring the contractor within the influence of this statute."

Of significance here is the following from State v. Birmingham Rail & Locomotive Co., 259 Ala. 443, 448, 66 So.2d 884, 889:

"It is an established rule of statutory construction that when a tax statute has been construed by the highest officials charged with the duty of administrating the tax laws, such construction should be given favorable consideration by the courts, especially if such construction has stood unchallenged for a considerable time. State ex rel. Fowler v. Stone, 237 Ala. 78, 185 So. 404; State v. Tuscaloosa Building & Loan Ass'n, 230 Ala. 476, 485, 161 So. 530, 99 A.L.R. 1019. And the weight to be given an administrative interpretation is increased when the legislature, in re-enacting the law, fails to indicate in any way its disapproval of the settled administrative construction. As held in State v. H. M. Hobbie Grocery Co., 225 Ala. 151, 153, 142 So. 46, 47, the re-enactment, without change, of a statute which has been given a uniform construction by the administrative department 'may be treated as a legislative approval of the departmental construction of the statute, quite as persuasive as the re-enactment of a statute, which has been judicially construed.' * * *"

See, also, State v. Helburn Co., 269 Ala. 164, 167, 111 So.2d 912; Glencoe Paving Co. v. Graves, 266 Ala. 154, 158, 94 So.2d 872; Ex parte Darnell, 262 Ala. 71, 82, 76 So.2d 770.

(II)

■ Standard contends that, "assuming the incidence of the tax to be as appellee claims, its activities in the performance of the contract in question were in interstate commerce," and for this reason, the license tax is invalid. The argument is that "the work itself—maintenance and improvement of the navigability of an artery of interstate commerce—constituted interstate commerce in the fullest constitutional sense"; that "much of the work—'the planning, engineering and administrative work * * * and executive and accounting control'—was performed at appellant's New Orleans office, from which the work was directed and supervised"; that "the job's

mechanical phase (dredging) cannot realistically be separated from its engineering and administrative phases, and that appellant's activities must be treated as one integrated operation in interstate commerce"; that "the measure of the tax sought to be enforced is the total contract price, and appellee has not even attempted to apportion the price between appellant's Alabama operations and its out-of-state activities in the performance of the contract; and a tax on gross receipts derived from interstate commerce is invalid."

The trial court held the license tax not to be violative of the commerce clause (United States Constitution, Art. 1, § 8, Cl. 3) for the reason that it "was directed at the privilege of the appellant carrying on certain local activities within the State of Alabama." We find no error in this holding. In so concluding we assume, without deciding, that Standard's activities constituted interstate commerce within the meaning of the commerce clause.

Standard places principal reliance on the following from Michigan-Wisconsin Pipe Line Co. v. Calvert, Tex.1954, 347 U.S. 157, 74 S.Ct. 396, 400, 98 L.Ed. 584:

> "It is now well settled that a tax imposed on a local activity related to interstate commerce is valid if, and only if, the local activity is not such an integral part of the interstate process, the flow of commerce, that it cannot realistically be separated from it. Memphis Natural Gas Co. v. Stone, 1948, 335 U.S. 80, 87, 68 S.Ct. 1475, 1478, 92 L.Ed. 1832; Western Live Stock v. Bureau of Revenue, supra [303 U.S. 250, at page 258, 58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944]."

It seems to us that the local activity of performing the contract in Alabama can realistically be separated from the interstate process or flow of commerce [assuming that Standard's overall activities here involved constituted interstate commerce]. The tax incidence is the performance of the contract in the State. It is not laid upon any other phase of Standard's activities. It is applicable alike to resident and nonresident contractors. There is no discrimination whatever against nonresidents. The performance of the contract admittedly was wholly within Alabama territory, without any possibility of any other state imposing a tax on such performance. We fail to see any unconstitutional burden or discrimination in the application of the license in this case. See Western Live Stock v. Bureau of Revenue, supra; McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876; Caskey Baking Co. v. Commonwealth of Virginia, 313 U.S. 117, 61 S.Ct. 881, 85 L.Ed. 1223.

Of particular significance is the following from the McGoldrick case [309 U.S. 33, 60 S.Ct. 391]:

> "Section 8, clause 3, article 1, of the Constitution declares that 'Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States * *.' In imposing taxes for state purposes a state is not exercising any power which the Constitution has conferred upon Congress. It is only when the tax operates to regulate commerce between the states or with foreign nations to an extent which infringes the authority conferred upon Congress, that the tax can be said to exceed constitutional limitations. See Gibbons v. Ogden, 9 Wheat. (US) 1, 187, 6 L.Ed. 23 (68); South Carolina Highway Dept. v. Barnwell Bros., 303 U.S. 177, 185, 58 S.Ct. 510, 513, 82 L.Ed. 734 (738). Forms of state taxation whose tendency is to prohibit the commerce or place it at a disadvantage as compared or in competition with intrastate commerce and any state tax which discriminates against the commerce, are familiar examples of the exercise of state taxing power in an unconstitutional manner, because of its obvious regulatory effect upon commerce between the states.

"But it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business, Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L. Ed. 823 (826), 115 A.L.R. 944. Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress. * * * Nor is taxation of a local business or occupation which is separate and distinct from the transportation or intercourse which is interstate commerce, forbidden merely because in the ordinary course such transportation or intercourse is induced or occasioned by such business, or is prerequisite to it. Western Live Stock v. Bureau of Revenue, supra, 303 U.S. 253, 58 S.Ct. (546) page 547, 82 L.Ed. 823 (826), 115 A.L.R. 944, and cases cited.

"In few of these cases could it be said with assurance that the local tax does not in some measure affect the commerce or increase the cost of doing it. But in them as in other instances of constitutional interpretation so as to insure the harmonious operation of powers reserved to the states with those conferred upon the national government, courts are called upon to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed. * * *

"Certain types of tax may, if permitted at all, so readily be made the instrument of impeding or destroying interstate commerce as plainly to call for their condemnation as forbidding regulations. Such are the taxes already noted which are aimed at or discriminate against the commerce or impose a levy for the privilege of doing it, or tax interstate transportation or communication or their gross earnings, or levy an exaction on merchandise in the course of its interstate journey. Each imposes a burden which intrastate commerce does not bear, and merely because interstate commerce is being done places it at a disadvantage in comparison with intrastate business or property in circumstances such that if the asserted power to tax were sustained, the states would be left free to exert it to the detriment of the national commerce.

"The present tax as applied to respondent is without the possibility of such consequences. Equality is its theme, cf. Henneford v. Silas Mason Co., 300 U.S. 577, 583, 57 S.Ct. 524, 527, 81 L.Ed. 814 (819). It does not aim at or discriminate against interstate commerce. * * *

"If, as guides to decision we look to the purpose of the commerce clause to protect interstate commerce from discriminatory or destructive state action, and at the same time to the purpose of the state taxing power under which interstate commerce admittedly must bear its fair share of state tax burdens, and to the necessity of judicial reconciliation of these competing demands, we can find no adequate ground for saying that the present tax is a regulation which, in the absence of Congressional action the commerce clause forbids. * * *"

See, also, Graves v. State, 258 Ala. 359, 62 So.2d 446; American Bakeries Co. v. City of Opelika, 229 Ala. 388, 157 So. 206; Sollitt & Sons Const. Co. v. Commonwealth of Virginia, 161 Va. 854, 172 S.E. 290, 91

A.L.R. 774, appeal dismissed 292 U.S. 599, 54 S.Ct. 632, 78 L.Ed. 1463, rehearing denied 292 U.S. 604, 54 S.Ct. 714, 78 L.Ed. 1466.

In Graves v. State, supra, the license involved was imposed on a transient photographer. What was there said is also pertinent here, viz. [258 Ala. 359, 62 So.2d 448]:

"* * * When a photographer comes into the State, or resides in the State, and moves about in it from place to place, pursuing his profession, he is an itinerant. Shiff v. State, supra. He is then in Alabama rendering some of the essentials of the art of photography as a business, the same as if he had a fixed location here. It is not necessary to perform all the essentials of the art in Alabama to constitute one a photographer subject to license as such in Alabama. The performance of an important feature of it in Alabama is justification for exercising the licensing power. Standard Oil Co. v. City of Selma, 216 Ala. 108, 112 So. 532; Sanford Service Co. v. City of Andalusia, supra. The distinction between such a situation and that of drummers soliciting and procuring sales to be consummated by interstate shipments has been narrowly drawn in express terms, as we have shown. The principle of the drummers' license cases has not been extended by the United States Supreme Court to a situation where there was locally performed an essential physical act in the performance of a transaction and where the license was directed solely at that local activity, and where it is not laid on interstate transportation nor is an undue burden upon it."

(III)

■ Standard's very limited argument that imposition of the license tax impairs the Federal maritime coasting licenses of its vessels leaves us unimpressed. The insistence is that "no state has the power to impose a condition precedent (i. e., a license tax) to the exercise of these federal licenses."

In the first place, the tax is not directed at the vessels or their operation; nor does it impair or affect the movement of said vessels. The tax incidence, as already discussed, is performance of the contract. The levy is not upon the means or machinery employed in doing the work. If Standard's vessels with maritime coasting licenses were used, such was by choice of Standard. Their incidental use in performing the contract cannot insulate Standard from the privilege license tax laid on such performance.

Another reason why Standard's argument is not well-taken is thus epitomized in Standard Dredging Corporation v. Murphy, 319 U.S. 306, 308, 63 S.Ct. 1067, 1068, 87 L.Ed. 1416:

"* * * The added contention that a vessel's federal license may bar state taxation is only another form of the argument that the tax burdens interstate commerce, * * *."

We have already concluded that the license tax is not an unconstitutional burden on interstate commerce. In each of the cases relied on by Standard (Moran v. City of New Orleans, 112 U.S. 69, 5 S.Ct. 38, 28 L.Ed. 653; Harmon v. City of Chicago, 147 U.S. 396, 13 S.Ct. 306, 38 L.Ed. 216; Sinnot v. Davenport, 22 How. 227, 63 U.S. 227, 16 L.Ed. 243; Foster v. Davenport, 22 How. 244, 63 U.S. 244, 16 L.Ed. 248) the tax was laid directly on the vessels or their operation. Such is not the situation now before us. Cf. Huron Portland Cement Company v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 818, 4 L.Ed.2d 852, which held Detroit's Smoke Abatement Code, as applied to ships owned by the Cement Company and operated in interstate commerce, to be constitutional. It was there said:

"An additional argument is advanced, however, based not upon the mere ex-

istence of the federal inspection standards, but upon the fact that the appellant's vessels were actually licensed, 46 U.S.C. § 263, 46 U.S.C.A. § 263, and enrolled, 46 U.S.C. §§ 259, 260, 46 U.S.C.A. §§ 259, 260, by the national government. It is asserted that the vessels have thus been given a dominant federal right to the use of the navigable waters of the United States, free from the local impediment that would be imposed by the Detroit ordinance.

"The scope of the privilege granted by the federal licensing scheme has been well delineated. A state may not exclude from its waters a ship operating under a federal license. Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23. A state may not require a local occupation license, in addition to that federally granted, as a condition precedent to the use of its waters. Moran v. New Orleans, 112 U.S. 69, 5 S.Ct. 38, 28 L.Ed. 653. While an enrolled and licensed vessel may be required to share the costs of benefits it enjoys, Huse v. Glover, 119 U.S. 543, 7 S.Ct. 313, 30 L.Ed. 487, and to pay fair taxes imposed by its domicile, Transportation Co. v. Wheeling, 99 U.S. 273, 25 L.Ed. 412, it cannot be subjected to local license imposts exacted for the use of a navigable waterway, Harman v. City of Chicago, 147 U.S. 396, 13 S.Ct. 306, 37 L.Ed. 216. See also Sinnot v. Davenport, 22 How. 227, 16 L.Ed. 243.

"The mere possession of a federal license, however, does not immunize a ship from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce. Thus, a federally licensed vessel is not, as such, exempt from local pilotage laws, Cooley v. Board of Wardens of Port of Philadelphia, 12 How. 299, 13 L.Ed. 996, or local quarantine laws, Morgan's Louisiana & T. R. & S. S. Co. v. Louisiana Board of Health, 118 U.S. 455, 6 S.Ct. 1114, 30 L.Ed. 237, or local safety inspections, Kelly v. State of Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3, or the local regulation of wharves and docks, Packet Co. v. Catlettsburg, 105 U.S. 559, 26 L.Ed. 1169. Indeed this Court has gone so far as to hold that a state, in the exercise of its police power, may actually seize and pronounce the forfeiture of a vessel 'licensed for the coasting trade, under the laws of the United States, while engaged in that trade.' Smith v. State of Maryland, 18 How. 71, 74, 15 L.Ed. 269. The present case obviously does not even approach such an extreme, for the Detroit ordinance requires no more than compliance with an orderly and reasonable scheme of community regulation. The ordinance does not exclude a licensed vessel from the Port of Detroit, nor does it destroy the right of free passage. We cannot hold that the local regulation so burdens the federal license as to be constitutionally invalid."

The decree appealed from is due to be affirmed. So ordered.

This case was submitted on briefs and assigned to two other Justices, successively, in the order of their ascendancy to the bench. It was assigned to the writer on January 11, 1960, for study and preparation of the opinion.

Affirmed.

LIVINGSTON, C. J., and LAWSON, STAKELY, MERRILL and COLEMAN, JJ., concur.