**STATE CORPORATION COMMISSION of Kansas, Richard C. Byrd, Chairman, Alvin F. Grauerholz and Harry G. Wiles, as Members of said Commission, and their respective successors in office, Appellants,**

v.

**BARTLETT AND COMPANY, GRAIN, a Missouri corporation, Appellee.**

No. 7933.

United States Court of Appeals Tenth Circuit.

Nov. 27, 1964.

See also D.C., 223 F.Supp. 975.

Robert C. Londerholm, Prairie Village, Kan., for appellants.

Charles B. Blackmar, Kansas City, Mo. (Erle W. Francis, Topeka, Kan. and James H. McLarney, Kansas City, Mo., on the brief), for appellee.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

SETH, Circuit Judge.

Appellant, the State Corporation Commission of Kansas, is charged with the duty of administering the laws of Kansas relating to motor carriers. Kan.G.S. § 66–139 (1949). The Commission is here attempting to assert jurisdiction over the appellee by requiring it to comply with rates set by the Commission for truck shipments of grain within Kansas. This is an appeal from a judgment of the United States District Court for the District of Kansas which restrained and enjoined the appellant from exercising such jurisdiction.

The stipulation of the parties shows the facts to be as follows: The appellee, Bartlett and Company, Grain, is a Missouri corporation, licensed to do business in Kansas, engaged in warehousing and merchandising grain. It operates "country elevators" in Kansas near where grain is produced, and in addition operates an elevator known as River Rail Terminal Elevator at Kansas City, Kansas. This terminal elevator is equipped for receiving grain by rail and truck, and for shipping grain by truck, rail, and barge.

All of the grain involved in this action is unprocessed wheat, corn, rye, barley, grain sorghums, and soybeans. It is purchased by the appellee either at its country elevators or at other interior points in Kansas and transported by truck to River Rail also in Kansas. The trucks in which the grain is moved are

neither owned nor operated by appellee, but are owned by various common, contract, and private carriers with whom appellee negotiates individually.

When the grain is delivered from the trucks at River Rail it is graded, tested, and deposited in a separate group of "truck" bins, used only for such purpose. This trucked grain is held exclusively for resale to customers located outside Kansas. Later, after it is deposited in the bins, the grain is mixed and blended in order to maintain and improve its quality and to provide accurately classified grain to meet the specifications of appellee's customers. During the harvest season truck shipments increase, but they take place during the entire year. The outbound shipments from River Rail proceed regularly throughout the year. While the appellee may have outstanding contracts for grain of certain grade and quality, no truckload or shipment is obtained to fill any particular outstanding contract.

■ The primary question to be decided in determining whether appellant may assert its jurisdiction over the rates charged by truckers carrying these shipments of grain to River Rail is, of course, whether the truck shipments are in intrastate or interstate commerce. It is well established that goods ultimately destined for shipment to another state acquire the character of interstate commerce as soon as they begin their journey, even though there is a temporary break in transit in the state of origin. However, this halt is an incident of the interstate movement. Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Chicago Board of Trade v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839. The principle applicable in determining whether a shipment is one in interstate commerce was stated by this court in Wycoff Co. v. Public Service Comm'n of Utah, 195 F.2d 252 (10th Cir.): "If there is a continuing intent that the goods shall be transported until they reach a designated place, the entire transportation is a continuing one, notwithstanding that there

may be a temporary stoppage enroute for a particular purpose." The court then cited United States v. Erie R.R., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187.

■ In the case of Texas v. Anderson, Clayton & Co., 92 F.2d 104 (5th Cir.), the Court of Appeals for the Fifth Circuit was confronted with a case very similar on its facts to the present case. The plaintiff there was a dealer in raw cotton who entered into contracts to supply cotton to out of state buyers. In order to fill these orders, it would purchase cotton and have it shipped to Houston. There it was weighed, sampled, classed, and assigned with similar cotton to orders in hand for shipment to foreign countries or states other than Texas. If it had not already been done, the cotton was compressed to high density. It was then shipped by ocean carrier usually after a delay of seven to eight days after receipt in Houston. The court there held that when the cotton was purchased and shipped to Houston it was the intention of the plaintiff that it would be ultimately shipped to other states and foreign countries. The court further held that the intention existing at the time the movement starts governs and fixes the character of the shipment, and temporary storage within the state of origin made necessary in furtherance of interstate shipment does not change its character. In the cited case the court placed emphasis on the fact that the cotton was already sold to out of state buyers before it was shipped to Houston. However, this fact is not determinative in itself, but is important because it demonstrates a continuing intent that the cotton remain in interstate commerce. In the case at hand, the stipulation of the parties shows that the grain was not always purchased to fill existing contracts out of state before it was shipped to the River Rail Terminal Elevator; nonetheless, all of the grain purchased for the truck bins was in fact eventually shipped to out of state purchasers. The record does not reveal a single instance where this was not the case. This certainly demonstrates an original intent

to move it in interstate commerce, and the deposit at the terminal elevator and the handling there did not change the character of the movement.

The United States Supreme Court, in Chicago Board of Trade v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839, held that the mere fact that grain in interstate commerce underwent temporary storage, inspection, weighing, grading, or mixing, and changing of ownership or destination, before continuing on to its destination, although it did not prevent the local taxation of the grain, did not take it out of interstate commerce so as to deprive Congress of regulatory power over it. Thus in the case at hand from the time of purchase and shipment to River Rail until the time it was sent to out of state buyers, the activities in connection with the grain were performed in furtherance of a clear intent that it ultimately be delivered to a buyer outside of Kansas. The shipment to River Rail was but the commencement of this movement.

The appellant contends that the decision of the United States Supreme Court in Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270, is controlling, and that the trial court erred in failing to follow that decision. However in this cited case the delivery of the oil to Florida clearly marked the end of the journey of the oil in foreign commerce. When the oil reached the storage places in Florida, this inventory of oil was solely for local sale and distribution. On the other hand, in the present case there is a continuing intent that the grain remain in interstate commerce until it reaches its destination at some point outside of the state of Kansas, and thus the truck shipment with which we are here concerned is in interstate commerce.

In its brief, appellant presents its case solely on the ground that the movement of grain here involved is not in interstate commerce and does not present an argument on whether the federal government has in the Motor Carrier Act preempted the field. The trial court

held that the Act purports to exercise complete jurisdiction, and no control of the rates remains in the state regulatory system. Appellee in its brief argues that the decisions of the Supreme Court demonstrate that the trial court was correct in finding federal preemption.

■■ It is well established that Congress may direct that federal regulation occupy only a limited portion of the particular activity being conducted in interstate commerce. See, e. g., Kelly v. Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3. The commerce clause does not wholly withdraw from the states the power to regulate matters of local concern with respect to which Congress has not exercised its power even though such state regulation may affect interstate commerce. California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219. Many cases define the standards to be applied in instances where there is some federal statutory regulation of the subject, and where there is none.

Part II of the Interstate Commerce Act, 49 U.S.C.A. §§ 301–327 (the Motor Carrier Act), rests comprehensive regulatory powers with the Interstate Commerce Commission over the transportation of property by truck in interstate commerce. It is provided at 49 U.S.C.A. § 303(b) that except for the sections relating to qualifications and hours of work of drivers and safety of operation or standards of equipment, the Act shall not apply to motor vehicles engaged in hauling certain classes of property. These exceptions include motor vehicles used to carry nonmanufactured agricultural commodities. The Supreme Court in East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917, stated that the purpose of this exception was to preserve for the farmers low cost transportation and refers to its legislative history. In California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219, the Court considered also the effect of an exception in the Act, now no longer in force, of share-the-ride agencies, and it there decided that such exception did not preclude

California from regulating such agencies. The Court referred to its prior highway safety and police power cases, and also pointed out the fraud to be prevented by the state regulation. This exception and state regulation appear to have been considered by the Court as a matter of local concern and of the police power of the state. The Supreme Court again considered the same activity after Congress had removed the exemption. California v. Zook, 336 U.S. 725, 69 S. Ct. 841, 93 L.Ed. 1005. The Court there considered the preliminary test to be uniformity versus locality or whether state interest is outweighed by national interest.

In the case at bar, the state interest is outweighed by the national interest. This case does not involve the exercise by the state of its powers over health and safety nor to protect its roads, as in Maurer v. Hamilton, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969, and South Carolina State Highway Dep't v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734. It is a proposed state regulation of rates and this has "commercial aims." Maurer v. Hamilton, supra. This might be considered to be a matter requiring exclusive federal regulation, under Ohio R. R. Comm'n v. Worthington, 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004, or under The Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, but in any event we hold that Congress intended the federal regulation and the exceptions to occupy the entire field, and be protected as found by the trial court. Although not free from doubt, the discussion of the exception here concerned by the House of Representatives as a Committee of the Whole shows the in-

tention was that trucks hauling non-manufactured agricultural products in interstate commerce be not regulated at all as to matters other than the qualification and hours of work of drivers and safety of operation or equipment standards.[1] This exception is of a different nature and purpose from the one concerned in California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219, and California v. Zook, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005.

We therefore hold that the federal government by the Motor Carrier Act has preempted the regulation of the carriers here concerned, and the exception from regulation is to prevail as against the attempt made here by the state of Kansas to regulate the carriers hauling unprocessed grains.

Affirmed.

---

[1]. Representative Holmes, a member of the House subcommittee which had held extensive hearings on the Act stated that the exception was to avoid any regulation whatsoever of the hauling of unprocessed agricultural products:

"MR. GILLETTE. That being the case, what was the object in providing an exemption for carriers of livestock exclusively or farm products exclusively? Why not regulate that? What was the object of the exemption?

"MR. HOLMES. The object was to help the farmer and keep him out of any regulation whatsoever insofar as handling unprocessed agricultural products or livestock on the farm. As an individual owner he would be exempt anyway and would not come under the provisions of the bill." 79 Cong.Rec. 12213, Part 11 (1935).

The subsequent discussion also indicates the intention that the carriers here concerned be not regulated.