92 N.J. Super. 148 (1966)
222 A.2d 522
THE CUNARD STEAM-SHIP COMPANY LIMITED, ETC., ET AL., PLAINTIFFS, AND ATLANTIC CRUISE LINE, INC., AND VIKING CRUISE LINES, FLAGSHIP LINE AGENCY, INC., INTERVENING PLAINTIFFS, AND NORTH GERMAN LLOYD, INTERVENING PLAINTIFF,
v.
LOUIS P. LUCCI, DEFENDANT, AND STATE OF NEW JERSEY, INTERVENING DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided July 28, 1966.
*150 Mr. Julius Poppinga for original plaintiffs (Mr. Bertram E. Busch and Mr. John R. Drosdick on the brief; Messrs. McCarter & English, attorneys).
Mr. Allan H. Klinger for intervening plaintiffs Atlantic Cruise Line, Inc. and Viking Cruise Lines, Flagship Line Agency, Inc. (Mr. Lawrence S. Grossman on the brief: Messrs. Milton, Keane & De Bona, attorneys).
Mr. Ralph P. Messano for intervening plaintiff North German Lloyd (Mr. William A. O'Brien, of counsel; Messrs. Messano and Messano, attorneys).
Mr. John E. Toolan for defendant (Messrs. Toolan, Haney & Romond, attorneys).
Mr. Richard Newman, Deputy Attorney General, for intervening defendant State of New Jersey (Mr. Theodore A. Winard, Deputy Atty. Gen., on the brief; Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
MATTHEWS, J.S.C.
In this action plaintiffs, both original and intervening, seek a declaratory judgment adjudicating that the provisions of N.J.S. 2A:170-77.13, and 2A:170-77.14 insofar as it applies to the former statute, are *151 unconstitutional.[1] The original plaintiffs instituting this action sought injunctive relief against defendant to restrain him from prosecuting them under eight or more complaints, alleging violation of the statutes in question in the municipal court of the City of Jersey City. On the return day of the order to show cause, the second group of plaintiffs was allowed to intervene, and an order for consensual preliminary relief was entered. Thereafter, at my direction, the matter proceeded as an action for the declaratory relief afore-mentioned. In addition to seeking the adjudication as to constitutionality, plaintiffs also ask the court to construe the provisions of N.J.S. 2A:170-77.13 with respect to certain questions raised which bear upon the determination of violations thereunder. See N.J.S. 2A:16-53. Since the constitutionality of a state statute is involved, the Attorney General has been notified and served under the provisions of R.R. 4:37-2, and has appeared herein through a deputy.[2]
The original plaintiffs and intervening plaintiff North German Lloyd are foreign corporations engaged in the business of operating ocean-going vessels between ports in the United States and foreign countries. The intervening plaintiffs Atlantic Cruise Line, Inc. and Viking Cruise Lines  Flagship Line Agency, Inc. are likewise steamship operating companies which conduct their operations through vessels registered under flags other than that of the United States. *152 Defendant Louis P. Lucci is by self-designation a member of the National Maritime Union, and is also employed by that union as a patrolman. He states in an affidavit filed in the cause that he has been a member of the union for approximately eight years. In his capacity as an employee of the union defendant, with the encouragement of his superiors, went to several travel agencies located within the cities of Jersey City, Bayonne and Hoboken for the purpose of procuring advertising brochures placed in the agencies on behalf of foreign steamship companies, and for the further avowed purpose of determining whether the same were in compliance with the statute in question. After procuring numerous brochures and folders, he proceeded to the municipal court of the City of Jersey City where he subsequently, with the sanction of his employer, filed upwards of 20 complaints against plaintiffs herein, alleging various violations of N.J.S. 2A:170-77.13. It was the filing and serving of these complaints which precipitated the present action.

I.
N.J.S. 2A:170-77.13, a supplement to our Disorderly Persons Act, is completely devoid of meaningful legislative history. It has been described in this cause by both the Attorney General and defendant as a consumer protection measure which has been enacted to provide for the safety of New Jersey citizens who seek passage on ocean-going vessels, by calling to their attention the foreign registry of vessels available for passage, thus alerting such would-be travelers to the supposedly known fact that the safety standards of foreign vessels do not measure up to those flying the American Flag.[3]
*153 Plaintiffs contend that the statute in question is union-sponsored and intended to reduce the bookings and profits of foreign corporations such as they. It is also claimed that the interest of defendant in prosecuting the municipal court complaints under the statute is other than altruistic. Without question, the National Maritime Union had interest in the passage and adoption of the statute in question and, indeed, similar statutes in other jurisdictions, for many reasons.[4]
I believe that it can safely be assumed that there is self-interest attributable to defendant, and thus indirectly his union, in supporting and enforcing a statute such as that *154 presently before the court. It is not too difficult to surmise that an organization such as the National Maritime Union, barred from conducting representation elections among crews of vessels registered in countries other than the United States,[5] would be interested in fostering, sponsoring and favoring legislation which might tend to encourage greater use by citizens of this State of American Flag vessels, instead of those registered in a foreign nation. As a general principle, there is nothing unlawful in such an attitude. However, it is not for this court to judge the motivation of the sponsors of the legislation, or the wisdom of the Legislature in enacting it. Such matters are, in fact, irrelevant to the ultimate question presently before this court. It can be of no moment that the statute is designed to appeal to the parochial prejudices of the American traveling public, or that Mr. Lucci, in filing his complaints, sought enforcement of the law for selfish reasons if, in fact, the law is valid.

II.
Both the individual defendant and the State contend that the statute in question should be upheld as constituting a valid consumer fraud prevention measure. It is not clear from the argument of either defendant as to the extent or manner in which the ocean-going public is to be protected from the defaults of foreign steamship companies by the statutory provisions here under review. This observation is made because the arguments of defendants tend to merge the concepts of financial responsibility of foreign steamship corporations and the safety measures employed by them.

A.
The power of the Federal Government to regulate national and international commerce is found in the United *155 States Constitution, Art. I, Sec. 8, cl. 3. The extent of this power has been debated and argued in legislative halls and courts since the institution of the Republic. The oft-cited opinion in Gibbons v. Ogden, 9 Wheat. (22 U.S.) 1, 6 L.Ed. 23 (1824), opened, but did not decide, the question of the validity of state regulation of interstate commerce in the absence of congressional legislation. This specific question later came before the Supreme Court of the United States in Cooley v. Board of Wardens of the Port of Philadelphia, 12 How. (53 U.S.) 299, 13 L.Ed. 996 (1851). The Supreme Court there sustained a Pennsylvania statute regulating pilots of vessels entering and leaving the Port of Philadelphia. The Pennsylvania statute obviously was a regulation of both interstate and foreign commerce. Mr. Justice Curtis, in an opinion for the majority of the court, set forth an interpretation of the commerce clause which has never been directly repudiated. He stated:
"Either absolutely to affirm, or deny that the nature of this power requires exclusive legislation by Congress, is to lose sight of the nature of the subjects of this power, and to assert concerning all of them, what is really applicable but to a part. Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." (12 How., at p. 319)
The standard set forth in Cooley is generally not regarded as being relied on as a source of state power to regulate any part of interstate commerce; rather, such power is generally derived from either the taxing or police powers of the several states. In the exercise of the police power the state restricts personal freedom and property rights, and sometimes imposes burdens upon, or affects, interstate commerce. In the latter connection, where the burden is only incidental and the restriction warranted by local needs, it is generally held that such local legislation is valid. However, even when there is no controlling federal legislation in the given area, a state may not regulate interstate commerce so as to restrict its flow *156 materially or to deprive it of necessary regulatory uniformity by "simply invoking the convenient apologetics of the police power." Kansas City Southern R. Co. v. Kaw Valley Drainage District, 233 U.S. 75, 79, 34 S.Ct. 564, 565, 58 L.Ed. 857 (1914). The test enunciated in Cooley was restated more broadly in the decision in Kelly v. State of Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937). Kelly involved state regulation of safety features of tugboats operating in both foreign and interstate commerce. The court stated the issues as follows:
"First. The first question is whether the state legislation as applied to respondents' motor-driven tugs is in all respects in conflict with express provisions of the federal laws and regulations. Wherever such conflict exists, the state legislation must fall. * * * [at p. 4, 58 S.Ct., at p. 89.]
Second. The next question is whether the federal statutes are to be construed as implying a prohibition of inspection by state authorities of hull and machinery to insure safety and determine seaworthiness in the case of vessels which in this respect lie outside the federal requirements. * * * [at p. 9, 38 S.Ct., at p. 91]
Third. The remaining question is whether the state law must fall in its entirety, not because of inconsistency with federal action, but because the subject is one as to which uniformity of regulation is required, and hence, whether or not Congress has acted, the state is without authority. [at p. 14, 58 S.Ct., at p. 94]"

B.
Most of the powers of our Federal Government have their immediate source in the Constitution, but not its power to deal in foreign affairs. If the power has its source in the Constitution at all, it is only in the sense that, having created a sovereign nation, the Constitution thereby bestowed upon the government of that nation all the powers implicit in sovereignty. Principal among these is the power to conduct its foreign affairs without limitation. See Chae Chan Ping v. United States, 130 U.S. 581, 604, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); Fong Yue Ting v. United States, 149 U.S. 698, 711, 13 S.Ct. 1016, 37 L.Ed. 905 (1893).
*157 It has become the accepted doctrine in American constitutional law that the power of the Federal Government over the country's foreign relations is necessary, complete and exclusive. It is not considered to be a mere aggregate of the powers enumerated in the Constitution. To the sum of enumerated powers has been added the powers implicit in the concept of sovereignty. Professor Corwin has described it as an inherent power "attributed to the National Government on the ground solely of its belonging to the American people" as a sovereign political entity at international law.[6]
This doctrine was firmly established by the Supreme Court of the United States in an opinion by Mr. Justice Sutherland in United States v. Curtiss-Wright Export Corporation, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936):
"It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality. Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens (see American Banana Co. v. United Fruit Co., 213 U.S. 347, 356, 29 S.Ct. 511, 53 L.Ed. 826); and operations of the nation in such territory must be governed by treaties, international understandings and compacts, and the principles of international law. As a member of the family of nations, the right and power of the United States in that field are equal to the right and power of the other members of the international family. Otherwise, the United States is not completely sovereign. The power to acquire territory by discovery and occupation (Jones v. United States, 137 U.S. 202, 212, 11 S.Ct. 80, 34 L.Ed. 691), the power to expel undesirable aliens (Fong Yue Ting v. United States, 149 U.S. 698, 705 et seq., 13 S.Ct. 1016, 37 L.Ed. 905), the power to make such international agreements as do not constitute treaties in the constitutional sense (Altman & Co. v. United States, 224 U.S. 583, 600, 601, 32 S.Ct. 593, 56 L.Ed. 894, Crandall, Treaties, Their Making and Enforcement [2d Ed.] p. 102 and note 1), none of which is expressly affirmed by the Constitution, nevertheless exist as inherently inseparable from the conception of nationality. This the court recognized, *158 and in each of the cases cited found the warrant for its conclusions not in the provisions of the Constitution, but in the law of nations." (299 W.S., at p. 318, 57 S.Ct., at p. 220)
In State of Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), Mr. Justice Holmes found it unnecessary to decide whether migratory birds were in interstate or foreign commerce. In upholding the congressional act there involved, he stated:
"It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, `a power which must belong to and somewhere reside in every civilized government' is not to be found." (at p. 433, 40 S.Ct., at p. 383)
There is no federal statute dealing with the areas ostensibly sought to be controlled by the legislation under review here. However, the Congress has presently before it several bills which propose to deal with the question of financial responsibility[7] and the safety standards[8] of vessels sailing from ports in the United States.
Senate Bill 3251, introduced by Senator Magnuson, contains a comprehensive proposal to: (a) eliminate the present limitations of liability of shipowners with respect to injury or loss of life of passengers or crew members; (b) require owners or charterers of vessels carrying over 50 passengers to satisfy the Federal Maritime Commission as to their financial responsibility for any liability due to death or injury by posting bond or meeting minimum insurance requirements, and (c) prohibit any person from offering or advertising passage on a vessel unless the Federal Maritime Commission is satisfied that sufficient funds are available to indemnify passengers for nonperformance.
*159 House Bill 10327 would prohibit owners or charterers of a vessel from arranging, offering or advertising an ocean cruise without first having filed with the Federal Maritime Commission a copy of a bond or other security, in such form as the Commission, by rule or regulation, might require and accept, for indemnification of passengers for nonperformance of an ocean cruise.
Senate Bill 3250 contains two important provisions: first, a requirement that those United States vessels which are exempt from modern United States standards because they were built before 1936, now meet modern standards; second, a requirement that all persons selling passage on United States or foreign passenger vessels notify passengers whether or not the vessel complies with safety standards.
House Bill 13126 would prohibit the advertising of trips on foreign vessels unless the advertisements contain the words:
"Foreign-flag passenger vessels are not subject to the same United States Coast Guard safety inspections required of United States-flag passenger ships."
International safety standards covering ocean-going passenger vessels are presently contained in the 1960 Safety-of Life-at-Sea Convention (SOLAS) to which the United States is a signatory.[9] This document, like its predecessor, the 1948 SOLAS Convention,[10] exempts ships built before the effective date of the Convention.

III.
In my judgment, N.J.S. 2A:170-77.13 presents an improper exercise of the state police power in that it impinges on areas reserved to the Federal Government under the supremacy clause (Art. VI) of the United States Constitution.
*160 I find that the statute is a regulation of and a burden on foreign commerce, an area left to the control of the Congress (United States Constitution, Art. I, Sec. 8, cl. 3.), except where incidental effect of state police enactments is deemed not unreasonably burdensome. Gibbons v. Ogden, supra. Primarily, the subject area sought to be affected by this legislation is national in scope, thereby necessarily requiring uniformity of regulation. Cooley v. Board of Wardens, etc., supra.[11]
Several similar but not identical statutes have been enacted at the state level, and at least two others are pending at this time.[12] Without discussion, it would be apparent that 50 such statutes may well serve to overburden foreign commerce. While it might be argued that a compliance with the most stringent of the seven existing laws, or the hypothetical 50, could serve to simplify the problem and thus unburden commerce, such a solution represents an oversimplification. That solution ignores such problems as statutory ambiguity, method of enforcement, and judicial construction. Moreover, even if, arguendo, we regard the New Jersey statute as the only one of its kind, and other states are foreclosed from enacting such statutes, it would still present a problem. On its face, our statute is extremely general. No one is charged with overseeing the prosecution of claims thereunder. While this latter observation is true with respect to most disorderly persons offenses, the distinguishing feature here is the proximity of a congressionally pre-empted area. To allow any New Jersey citizen to initiate a complaint against foreign carriers might well serve to invite unthoughtful or invidious acts in *161 an area where the state must necessarily step most carefully. Under the facts of this action, there is presented rather adventuresome conduct on the part of the individual defendant, who has chosen apparently stable and well-known foreign shipping companies as the objects of his complaints. The courts clearly cannot promote harassment of foreign commerce through the vehicle of such a hopelessly vague statute.
N.J.S. 2A:170-77.13 must also be regarded as invalid under a second test of the commerce clause. Congress has enacted several provisions in the Shipping Act, 46 U.S.C.A. § 1 et seq., related to "labeling," safety, etc.[13] While it is true that the exact subject matter sought to be regulated by our New Jersey statute is not covered in any of these laws, it is not unreasonable to surmise that the present void in federal regulation of safety on foreign vessels might well be the result of a reluctance on the part of the Congress to legislate in an area occupied by the Executive. The SOLAS treaty, supra, may indeed represent a compromised attempt to protect the American traveler, but it is, nonetheless, the result of executive action. The Congress, in all probability, has an area of discretion here, but reluctance to undermine the Executive is understandable.[14] It is not unreasonable to conclude, accordingly, that the Congress has chosen, for the present, to leave this area vacant, thereby barring state regulation. Cooley v. Board of Wardens, etc., supra. Of course, should Congress enact any of the House or Senate bills presently pending (mentioned in marginal notes 7 and 8), the New Jersey statute would probably be pre-empted.
I further conclude that the statute in question also offends another area of federal pre-emption  the foreign affairs power. Clearly, that power is reserved to the federal *162 executive, and it, in conjunction with the supremacy clause, bars parallel state activity. See, e.g., United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942). Cf. In re Alexandravicus, 83 N.J. Super. 303 (App. Div. 1964). Consider United States v. States of Louisiana, etc., 363 U.S. 1, 30-36, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960). As has been indicated heretofore, the matter of international safety on passenger vessels has been the subject of a treaty or convention among nations. SOLAS, supra. The majority of the foreign steamship lines operating in ports of the United States are either nationally owned or nationally subsidized companies. The field of international affairs is one requiring sensitive and delicate negotiations. It should be obvious that state action that might interfere with the balance of international relationships could only serve to encumber hopelessly the prerogatives of both the Executive and Congress with respect to this subject matter; this must be regarded as so notwithstanding the good intentions of the legislature of any state. The legislatures of individual states or of the several states cannot determine foreign policy, nor can they provide interest groups or individuals with that right. The statute here under review seeks to speak in this forbidden area. It cannot be permitted to do so.
In view of my determination that N.J.S. 2A:170-77.13, and 77.14 insofar as it applies to the former statute, contravenes the constitutional provisions hereinbefore mentioned, it is unnecessary for me to decide the other issues raised by plaintiffs. I do note, however, that when a state legislature enters into an area which is proximate to federally pre-empted subject matter, it must be articulate beyond the requirement of ordinary due process considerations.
A judgment in conformity with the conclusion set forth herein may be settled on notice or by consent of the parties. No costs.
NOTES
[1] Unlawfully advertising passage upon vessel
No person issuing, selling or offering to sell any ticket for passage aboard any such vessel shall directly or indirectly cause to be placed before the public in this State any advertising matter or information pertaining to passage or the availability of passage upon any such vessel, unless such advertising matter or information clearly indicates the country of registry of such vessel. L. 1964, c. 230, § 2,"
"2A:170-77.14 Penalty
Any person who willfully violates any provision of this act is a disorderly person. L. 1964, c. 230, § 3."
[2] A companion statute N.J.S. 2A:170-77.12, dealing with the sale of steamship tickets, is not a subject of these proceedings. The statute requires the imprinting of the country of registry on any ticket sold for passage aboard any vessel required by law to be registered.
[3] No statement appeared on the original bill, S. 167, introduced February 10, 1964, which was finally passed by the Legislature on May 11, 1964, nor its successor, S. 412, introduced November 16, 1964 and passed by the Legislature December 17, 1964 and signed by the Governor on December 22, 1964. The original bill, which was a more concise version of the present law, made a violation thereof a misdemeanor. That bill, which, as indicated, finally passed both houses of the Legislature on May 11, 1964, was filed by the Governor in the State Library on March 8, 1965, having been vetoed in effect under provisions of Art. V, Sec. I, par. 14(b) of our 1947 Constitution. The only reason given by the Governor for his action as to the prior bill was the subsequent enactment and his approval of the latter. Upon signing the bill into law on December 22, 1964, the Governor released the following statement:

"Senate Bill No. 412 represents a necessary step forward in the vital area of consumer protection. In recent years thousands of persons have undertaken sea voyages, many for the first time. What used to be a luxury for the few or an activity for business men, has developed into an enjoyable pastime for much of the general public.
There are wide variations in the safety standards to which vessels of different national registries are required to adhere. The highest standards are maintained by United States vessels. Without means of identification, however, many persons are selecting vessels which they believe to be of American registry, in fact, are not. The people of New Jersey should be informed of the country of registry on which they secure passage and to which they entrust their very lives.
The provisions of this bill, coupled with an intensive program which I understand will be undertaken to educate the public in this respect, should help better equip the traveling public to make a sound selection of ships to sail upon."
[4] The following entries appear in the 1964 New York Times Index:

"National Maritime Union president, Curran, urges passage of Federal and State laws to require lines advertising in the United States to identify the nation of registry; charges that ships are registered in Panama and Liberia to avoid United States safety standards. April 13, page 58, col. 8; New Jersey State Industrial Union Counsel urges Governor Hughes sign bill to require advertisements to state country of registry; Counsel president, Jacobson, stressed need to protect consumer from unsafe ship. July 15, page 70, col. 7."
[5] See McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Incres Steamship Co. v. International Maritime Union, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963).
[6] Corwin, The Constitution and World Organization, 19 (1944)
[7] See H.R. 10327, 89th Cong., 1st Session; H.R. 12996 (ibid.); S. 2417 (ibid.); S. 3251 (ibid.); see further H.R. Report No. 1089, dated September 23, 1965, to accompany H.R. 10327.
[8] See S. 3250, 89th Cong. 1st Session; H.R. 13126 (ibid.)
[9] Proclamation No. 3632, 29 F.R. 19167 (1964), found in note to 33 U.S.C.A. § 1051.
[10] Exec. Order No. 10402, 17 F.R. 9917 (1952), found in note to 33 U.S.C.A. § 143.
[11] Compare Kelly v. State of Washington, supra, and Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1959), with Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), and Di Santo v. Commonwealth of Pennsylvania, 273 U.S. 34, 47 S.Ct. 267, 71 L.Ed. 524 (1926).
[12] California, Illinois, Maryland, Massachusetts, New York and Pennsylvania presently have such statutes. Statutes are pending in Alabama and Texas.
[13] See, in particular, 46 U.S.C.A. §§ 4, 11, 18, 46, 48, 390 c, 481(b)(2).
[14] See "Congress Must Take Action," by Senator Warren C. Magnuson, Chairman, Senate Committee on Commerce, Trial, vol. 2, No. 4, June/July, 1966, p. 8; New York Times, Monday, June 27, 1966, p. 69; id., Wednesday, July 27, 1966, p. 78.