11 Mass. App. Ct. 571 (1981)
417 N.E.2d 987
DONALD H. SLEEPER
vs.
OLD KING'S HIGHWAY REGIONAL HISTORIC DISTRICT COMMISSION.
Appeals Court of Massachusetts, Barnstable.
December 12, 1980.
March 13, 1981.
Present: GREANEY, ROSE, & KASS, JJ.
Duane P. Landreth for the plaintiff.
*572 James R. Wilson for the defendant.
KASS, J.
Donald H. Sleeper is an amateur radio operator who desires to erect an antenna sixty-eight feet high in the backyard of his residence in East Dennis. It is his misfortune that his home is located in the Old King's Highway Regional Historic District, established by St. 1973, c. 470, as amended by St. 1975, c. 298; St. 1975, c. 845; St. 1976, c. 273; and St. 1977, c. 38 (hereinafter the Act). Under § 6 of the Act, no structure may be erected within the district without the issuance of a "certificate of appropriateness" by the town historic district committee of the town within which the proposed structure is to be located.
Denied a certificate of appropriateness on August 11, 1977, by the historic district committee of Dennis (committee), Sleeper exercised his rights under § 11 of the Act to appeal to the regional historic district commission (commission), which found that the committee had acted properly.[1] He thereupon proceeded under the second paragraph of § 11 of the Act with an appeal from the action of the commission to the Second District Court of Barnstable, the district court having jurisdiction over the affected town. That court affirmed the decision of the commission and Sleeper took the next step available to him under the statute: an appeal to the Southern Appellate Division District of the District Courts. The District Court judge who had heard the case reported it to the appellate division, which, finding no error, dismissed the report. Thereupon, Sleeper appealed to the Supreme Judicial Court which, acting under G.L.c. 211, § 4A, transferred the case to this court. We affirm.
Sleeper's house is not itself historic. It was only about ten years old when Sleeper undertook to build his radio tower in 1977. The house is located in a subdivision of 109 lots, *573 which are occupied by one-story ranch style houses of substantially the same vintage as Sleeper's. Fifty-six of the houses have television antennae on roofs and five have pole or whip CB (citizens' band) antennae which stand seventeen to twenty feet above the roof line. Telephone poles carry electric service and telephone service to the area. Although resolutely contemporary, the subdivision in which Sleeper lives is within the Scargo Hill area, to which the commission and reviewing courts attributed historic significance. The tower on Scargo Hill itself is prominent and something of a landmark on Cape Cod. It and Scargo Lake are the subject of Indian legend. There is also a historically significant place called Hokum Rock.
1. The standard of "appropriateness." Hokum is what Sleeper ascribes to the finding of the regional commission that the visual impact of the radio tower was unacceptable. Conceding the existence of conventional television antennae in the area, the commission described Sleeper's proposed radio tower as "grossly inappropriate" by comparison. Sleeper argues that in the context of a late-Twentieth Century subdivision there is nothing discordant about a late-Twentieth Century radio antenna. It is a position that has some allure. Under § 10 of the Act, however, the committee, in passing upon the quality of appropriateness, shall consider "the historical value and significance of the ... structure ... involved and the relation of such factors to similar factors of buildings and structures in the immediate surroundings." The committee shall also consider "settings, relative size of buildings and structures...." A purpose of the Act, as set forth in § 1, is to preserve settings "within the boundaries of the regional district." Given these statutory criteria, the finding by the reviewing court of the historic significance of the Scargo Hill area as a whole and the generally low physical profile of the structures surrounding Scargo Hill, it is difficult to quarrel with the conclusion that a sixty-eight foot steel structure is not evocative of what § 1 of the Act says is to be promoted: "the aesthetic tradition of Barnstable County, as it existed in the early days of Cape *574 Cod." At least such a conclusion is not an irrational or whimsical view of the problem.
The purpose of the statute is to suppress the obviously incongruous. See Gumley v. Selectmen of Nantucket, 371 Mass. 718, 724 (1977) (considering similar legislation establishing a historic district in Nantucket). The Act does not exempt, from the restrictions it imposes, subareas within the historic district which, taken in isolation, may have little or no historic significance. Compare Berman v. Parker, 348 U.S. 26, 34-36 (1954). The committee, therefore, acted neither on a legally untenable ground nor unreasonably, whimsically, capriciously or arbitrarily. See MacGibbon v. Board of Appeals of Duxbury, 369 Mass. 512, 515-516 (1976); Gumley v. Selectmen of Nantucket, 371 Mass. at 724.[2]
2. Hardship. The Act confers upon the committee authority to approve inappropriate structures to avoid "substantial hardship." See § 10.[3] Being prevented from engaging in his hobby to the fullest, while undoubtedly a blight on Sleeper's spirit, is not a hardship in the statutory sense. See Wolfson v. Sun Oil Co., 357 Mass. 87, 90 (1970) (inability to use land to maximum economic potential is not a hardship). Not much need be said about Sleeper's argument that under the Act, a lesser quantum of misfortune entitles the sufferer to a hardship exception. Were that so, the exception would quickly swallow the rule. Compare Pratt v. Building Inspector of Gloucester, 330 Mass. 344, 345-347 *575 (1953). The failure by either the commission or the committee to make written findings on the hardship question is without consequence since, on the facts agreed upon and found, hardship could not have been found as a matter of law.
3. Sufficiency of "appropriateness" criteria. Sufficient explication of the elements of appropriateness appears in the Act to fend off Sleeper's attack on the ground of impermissible vagueness. A committee is to consider the historical value and significance of the structure, the general design, arrangement, texture, material, color, the setting, and immediate surroundings, with a view toward avoiding exterior effects "obviously incongruous to the purposes set forth in this act." Similar elements of appropriateness have been found sufficient. Opinion of the Justices, 333 Mass. 773, 775, 778-781 (1955). See MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635, 638 (1970); Gumley v. Selectmen of Nantucket, 371 Mass. at 722-723. Compare North Landers Corp. v. Planning Bd. of Falmouth, 382 Mass. 432, 438-445 (1981).
4. Federal preemption and interstate commerce. Although the Federal Communications Act of 1934, 47 U.S.C. §§ 151-609 (1976), preempts "local regulation of radio transmission, including assignment of frequencies, interference phenomena, and the content of broadcast material," Schroeder v. Municipal Court, 73 Cal. App.3d 841, 846 (1977), appeal dismissed, 435 U.S. 990 (1978), it does not purport to regulate the manner in which physical structures involved in radio transmission have an impact upon local land use considerations. The regulation, for example, of antenna height is a matter of local concern, not national interest. Kroeger v. Stahl, 248 F.2d 121, 123 (3d Cir.1957). Skinner v. Zoning Bd. of Adjustment of Cherry Hill, 80 N.J. Super. 380, 392 (1963). Note, State Regulation of Radio and Television, 73 Harv. L. Rev. 386, 395 (1959). Note, 44 Cornell L.Q. 94, 96-103 (1958). The local regulation conflicts with no Federal law, and Congress has evidenced no design to preempt land use questions. See e.g., Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141 (1963).
*576 Nor is there any better force to Sleeper's argument that the prohibition of his tower is an unwarranted interference with interstate commerce. If Sleeper is engaged in commerce at all, the effect of the Act is not so "direct and positive" as to raise a commerce clause question. Kroeger v. Stahl, 248 F.2d at 123. See Kelly v. Washington, 302 U.S. 1, 10 (1937).
5. First amendment rights. Reasonable restrictions on the time, place and manner of free speech are consistent with the first amendment. See Cox v. New Hampshire, 312 U.S. 569, 575-576 (1941); Columbia Bdcst. Sys., Inc. v. Democratic Natl. Comm., 412 U.S. 94, 121 (1973); Schroeder v. Municipal Court, 73 Cal. App.3d at 847-848.
6. De facto taking. The suggestion that the Act, as applied, amounts to a taking of property from Sleeper without just compensation is wholly devoid of merit. See Opinion of the Justices, 333 Mass. at 777-778 (Historic Nantucket District). Opinion of the Justices, 333 Mass. 783, 790 (1955) (Historic Beacon Hill District). See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 138 (1978) (application of New York city's landmark law).
Order dismissing report affirmed.
NOTES
[1] The Act (§ 11) requires the commission to find whether "the committee exceeded its authority or exercised poor judgment, was arbitrary, capricious, or erroneous in its action." Although the commission did not use the statutory vocabulary, its conclusion that the committee "properly denied the issuance of a certificate of appropriateness" has the same meaning.
[2] States differ as to the degree of tolerance they afford radio antennae in residential zones. Compare Wright v. Vogt, 7 N.J. 1 (1951) (erection of radio tower in residential zone for use by amateur as hobby is permissible accessory use) with Presnell v. Leslie, 3 N.Y.2d 384, 388 (1957) (erection of forty-four foot radio tower not an accessory use incidental to residential area). See generally Note, 44 Cornell L.Q. 94, 104-106 (1958). See also on the general subject of land use regulation to achieve aesthetic ends, John Donnelly & Sons v. Outdoor Advertising Bd., 369 Mass. 206, 219-221 (1975), and articles cited in nn. 12 & 13.
[3] The hardship exception language is substantially similar to the language authorizing zoning variances, which appears in G.L.c. 40A, § 10. See G.L.c. 40A, § 14(3), prior to St. 1975, c. 808, § 3.