McHugh, J.
I. Background
This is an action brought by the Federated Church (“the Church”), a charitable corporation located in the Town of Edgartown, Massachusetts, seeking judicial review of a decision of the Edgartown Historic District Commission (“the Commission”) and a judgment declaring that a cease and desist order the Commission issued is invalid. For its part, the Commission seeks enforcement of the cease and desist order. At bottom, the controversy centers on whether the Church may use vinyl siding to cover three exterior sides the Parish House adjacent to the Church in lieu of the wooden siding that theretofore existed.
Based on the stipulations made by the parties, the view I took, the evidence presented during the course of the trial and the reasonable inferences I have drawn from all of those sources, I make the following
II. FINDINGS OF FACT
As stated, plaintiff is the Federated Church, a charitable corporation located within the Town of Edgartown. The Church is the beneficial owner of a church building and Parish House located at the intersection of South Summer and Cooke Streets in Edgartown. The intersection, and thus the Church and Parish House, lie at the western edge of the Edgartown Historic District, a district that covers most of downtown Edgartown.
The defendant Historic District Commission was created by the Town of Edgartown on April 14, 1987, pursuant to the Commonwealth’s Historic Districts Act, G.L.c. 40C. The Edgartown Historic District bylaw essentially tracks the language of c. 40C and, as a consequence, provides in relevant part as follows:
SECTION 1 — PURPOSE
The purpose of this by-law is to promote the educational, cultural, economic and general welfare of the inhabitants and property owners of the Town of Edgartown through the preservation and protection of the distinctive characteristics of buildings and places of historical significance to the Town or the architecture of such buildings and places, and through the maintenance and improvement of settings for such buildings and places and the encouragement of design compatible therewith.
SECTION5— CERTIFICATES OF APPROPRIATENESS, NONAPPLICABILITY OR HARDSHIP
Except as this by-law may otherwise provide in accordance with Section 8 or Section 9, no building or structure within the historic district shall be constructed or altered in any way that affects exterior architectural features unless the commission *213 shall first have issued a certificate of appropriateness, a certificate of nonapplicability, or a certificate of hardship with respect to such construction or alteration. Any person who desires to obtain a certificate from the commission shall file with the commission an application ... in such form as the commission may reasonably determine together with such plans, elevations, specifications, material and other information ... as may be reasonably deemed necessary by the commission . . .
SECTION 6 — STANDARDS OF REVIEW
In passing upon matters before it, the commission shall strive to advance the purposes of this by-law, and shall consider, among other things, the historical and architectural value and significance of the site, building or structure, the general design, arrangement, proportions, texture, material and color of the features involved, the relation of such features to similar features of buildings and structures in the surrounding area, and the position of such buildings or structures in relation to the public streets, public ways, public parks or public bodies of water in the surrounding area . . .
SECTION 7 — STANDARDS OF REVIEW
. . . While the commission shall encourage owners of buildings and structures in the historic district to use historically authentic materials whenever reasonable for any construction or alteration, the use of any particular material shall not be prohibited based upon its composition alone. It is not the intent of this by-law to require that buildings and structures in the historic district be maintained as historic artifacts. Rather, the commission is required to apply the standards set forth herein . . . in order to protect and preserve the general flavor, and the distinctive characteristics and architecture of the historic district.
SECTION 10 — COMMISSION POWERS, FUNCTIONS & DUTIES
The commission shall have the following additional powers, functions and duties:
(a)If the commission determines that the construction or alteration for which an application for a certificate or appropriateness has been filed will be appropriate for and compatible with the preservation or protection of the historic district, the commission shall cause a certificate of appropriateness to be issued to the applicant. In the case of a disapproval, the commission shall place upon its records the reasons for such [d]etermination, and shall forthwith cause a notice of its determination, accompanied by a copy of the reasons therefor as set forth in its records, to be issued to the applicant, and the commission may make recommendations to the applicant with respect to appropriateness of design, arrangement; texture, material and similar features . . .
(b) . . .
(c) If the construction or alteration for which an application for a certificate of appropriateness has been filed shall be determined to be inappropriate, or in the event of an application for a certificate of hardship, the commission shall determine whether, owning to conditions especially affecting the building or structure involved, but not affecting the historic district generally, failure to approve an application will involve a substantial hardship . . . and whether such application may be approved without substantial detriment to the public welfare and without substantial derogation from the intent and purposes of this by-law and the Historic Districts Act. . .
(f) The commission shall file with the Town Clerk ... a copy or notice of all certificates and determinations of disapproval issued by it.
SECTION 12 — PROCEDURE IN DECISION MAKING
As soon as convenient after such public hearing, but in any event within sixty (60) days after the filing of the application . . . the commission shall make a determination on the application. If the commission shall fail to make a determination within such period of time, the commission shall thereupon issue a certificate of hardship.
See generally G.L.c. 40C, §§2, 6, 7, 10 & ll.[1]
In October of 1993, the Church[2] applied to the Commission for permission to make certain renovations to the Parish House that would bring the house into conformity with the current building code and would add to it a second story. The second story, in turn, would add approximately ten to fifteen percent to the building’s total square footage. The Commission approved the application without difficulty on October 8, 1993.
Approval in hand, the Church solicited bids for the renovations. In the process of obtaining those bids, the Church learned that the clapboards on the Parish House were so deteriorated that they no longer would hold a fresh coat of paint and thus would have to be replaced. Faced with an unexpected capital expenditure for replacing the clapboards, and with the expense of periodic paintings, the Church membership decided to proceed with vinyl siding as an alternative. Vinyl siding requires less periodic maintenance although there is no evidence that the initial cost of acquiring and installing vinyl is any less than the cost of acquiring and installing wooden clapboard.
Having made that decision, the Church consulted with a member of the Commission about the procedures it was required to follow in order to cany out its plans for the siding and was informed that a new application would be required. Accordingly, on May 3, 1994, the Church filed an amended application seeking to substitute vinyl siding for the wood clapboard *214 on the sides and rear of the Parish House. On the side facing South Summer Street, the Church decided, for aesthetic reasons, to replace the dilapidated clapboard with new wood.
The Church’s application was delivered to the Commission on the Commission’s standard form. Across the top of the first page of the form appeared the words “application for certificate of,” beneath which were three boxes for the applicant to check, one next to the word “[appropriateness,” one next to the word “ [n] onapplicability” and the third next to the word ”[h]ardship.” The Church checked the boxes marked “[appropriateness” and “[h]ardship.”
The remainder of the Church’s application was essentially unilluminating. On page two, in the section labeled “condensed specifications of proposed work,” the Church stated that it intended to replace white clapboard “sidewalls” with white vinyl siding sidewalls. In the section of the application calling for plot plans, elevations, samples of colors and the like, the Church simply referred to its previous application. Finally, the section of the application entitled “other material that will support your application” was blank.
The Church filed its application with the Commission on May 3, 1994. On May 17, 1994, the Commission held a public hearing on the application. Church representatives who appeared at the hearing told the Commission that over fifty percent of the white “clapboard” buildings in the Edgartown Historic District were covered with white vinyl on some or all of their sides. Church representatives also informed the Commission that the Church had recently spent over $50,000 to make improvements to and paint the Church and had spent approximately $10,000 for a new entryway to the Parish Hall. They also told the Commission that the Church planned to spend $60,000 for the additions that were the subject of the pending' proposal and its immediate predecessor. Those expenditures, Church representative informed the Commission, would deplete the Church’s capital account. Significantly, however, Church representatives did not suggest that vinyl siding would be less expensive to obtain or install than the original clapboard siding.
The record is not entirely clear about what Church representatives told the Commission about painting costs. Nevertheless, I find, on conflicting evidence about the length of time a coat of paint will last if applied to properly prepared wood, that clapboard siding requires repainting about every five years. Currently the cost of painting the Parish House approximates $2,200.
The Commission heard from others, some of whom favored and some of whom opposed allowance of the petition. At the conclusion of the hearing, each member of the Commission gave his or her analysis of the petition. Then the Commission voted, four to three, to deny the application.[3] Church representatives were present when that vote was taken. The minutes of the May 17 meeting noted that the Commission had voted to deny the application and stated that a “written decision [was] to follow.”
As stated earlier, the only portion of the Church’s application that dealt with the question of “hardship” was the small box checked at the top of page one of the application itself. There is no evidence that the Church presented any significant information on the hardship question to the Commission during the course of the May 17 hearing apart from information about the cost of the renovations and the fact that the renovations would deplete the Church’s capital fund. At the conclusion of the hearing, the application as a whole was denied in the presence of representatives of the Church. There is no suggestion anywhere in the record that the Commission’s vote denied anything less than the entire application. Under all of the circumstances, I am persuaded, and therefore find, that the Commission acted on, and denied, both the application for a certificate of appropriateness and the certificate of hardship and that both the Church representatives and the Commission believed that that is what the Commission had done.
In any event, the Commission’s written decision did in fact follow, but not for a while. The decision was dated August 18, 1994 and was filed with the Town of Edgartown Clerk on September 21, 1994. The decision, a copy of which was admitted as Exhibit 7, summarized the Commission’s reasons for its decision in the following fashion:
[U]se [of vinyl siding] lacks historical architectural integrity and compromises those characteristics which helped to define the historic district. Substitute materials destroy and/or conceal the historic fabric, thereby subtracting from the basic integrity of historically significant buildings. Character defining elements and details are significantly altered or lost with the application of artificial siding. If these elements and details are altered on a number of buildings within the Historic District then the historic character of the entire district may be compromised. This creates the potential for resulting confusion as to the perception of what is truly historic versus what is only imitative. Further, artificial siding potentially conceals problems that are early warning signs of deterioration and structures that are in need of maintenance and repair. If normal maintenance and repairs are not performed, entire structures within the district may be lost due to irreparable decay. Finally, when artificial siding dents, shatters or fades, its lack of historical appropriateness is much more evident and repairs are virtually impossible. Thus, it is our standing [sic] that the application of artificial siding is not appropriate on structures within the Historic District.
*215 With regards to the Federated Church, since the Meeting House is one of the most prominent buildings of the Historic District, the close proximity of the parish house to the Meeting House warrants careful consideration. We feel that use of artificial siding on this structure would set an unfortunate precedent.
Unfortunately, before the board issued its written decision, the Church acted. On July 18, 1994, the Church filed with the Edgartown building inspector an application for a building permit to allow use of vinyl siding in the renovations the Church then was undertaking. The application was granted.[4] The Church then proceeded with the renovations using the vinyl siding. The Commission later learned of the Church’s activities. As a consequence, the Commission issued an order on September 28,1994, requiring the Church to cease and desist from placing additional vinyl siding on the Parish Hall and requiring the Church to remove by October 3, 1994, the siding it had already installed. The Church did not remove any siding and proceeded to complete the renovation work using vinyl siding. All work was completed prior to trial.
As matters now stand, then, three sides of the Church are encased in vinyl siding while the fourth, facing South Summer Street, has retained the original clapboard. All four sides of the Parish House are visible from the street and thus all four are subject to the regulations governing the Historic District.[5]
As stated, the Historic District comprises much of the center of Edgartown. Approximately fifty percent of “clapboard” structures in the Historic District are covered with vinyl siding. All of that vinyl siding, however, was originally installed prior to Edgartown’s creation of the Historic District. Although the Commission has authorized use of vinyl siding to replace existing vinyl, it never has authorized anyone to replace clapboard with vinyl.
The Edgartown weather, like the weather throughout the Cape and the Islands, has a negative effect on the paint on clapboard structures. Throughout the Historic District, one can observe numerous clapboard buildings with peeling paint. At any given time, therefore, the Historic District hosts an array of clapboard buildings ranging from the freshly painted to the badly peeling. That kind of array, however, characterizes any cluster of clapboard buildings exposed to oceanside weather.
Vinyl, of course does not peel. While there is a visible difference between vinyl siding and clapboard siding, the difference is subtle at mid-day and more pronounced in the early morning or late afternoon. Moreover, a small piece of vinyl, similar to a piece of molding, must be installed where vinyl siding joins a window or turns a corner. That “molding” is visible and immediately distinguishes vinyl from clapboard siding. Again, however, the distinction is a subtle one. Overall, while those who look at buildings with an eye to differentiate between vinyl and clapboard can readily see the difference, most casual observers are unlikely to distinguish between the two.
As a final note, the Commission’s opposition to vinyl siding has both an aesthetic and a structural component. The former, as the label suggests, has to do with the appearance of vinyl siding in comparison to the appearance of painted clapboard. The latter has to do with the Commission’s concern that use of vinyl siding is likely to conceal, and even to aggravate, structural damage to wood framing the vinyl covers.
The Commission is not alone in its concern about vinyl siding’s potential adverse impact on encased wood. Indeed, a policy statement promulgated by the Massachusetts Historical Commission, see G.L.c. 9, §26, provides in pertinent part as follows:
The application of vinyl siding is not a recommended treatment for historic wood buildings. Siding can prevent a wood framed building from “breathing,” thereby trapping moisture within the walls and encouraging structural deterioration and damage to interior finishes. The moist environment created when wood buildings are clad in vinyl can also promote infestation by termites, beetles, and carpenter ants; due to the vinyl cover, substantial damage can occur before the pests are discovered. Some siding is manufactured with “weepholes” for moisture drainage; however, peeling paint, dead insects, and other debris can block the holes and trap moisture.
In addition, although synthetic siding may temporarily hide problems such as peeling paint and deterioration, it is not a substitute for proper building maintenance. Studies show that a quality paint job will last five to eight years and that chronic paint failure is often an indication of moisture penetration due to flaws in the roofing, flashing or drainage systems, problems which will not be corrected by vinyl siding.[6]
To be sure, when vinyl siding is carefully installed, when it is installed with adequate “weep" holes so that drainage may occur and when adequate attention is paid to keeping the weep holes open, the structural problems referred to by the Massachusetts Historical Commission can be minimized. Moreover, many of the same kinds of problems can occur if wooden clapboard is not painted properly. Indeed, those who paint clapboard must take care not to paint over the junction where one piece of wood overlaps the next lower piece. Sealing that junction with paint creates a solid curtain wall that can cause many of the problems vinyl siding can cause for many of the same reasons.
III. CONCLUSIONS OF LAW
Against the foregoing backdrop plaintiff raises three principal questions of law. First is whether the Commission made and recorded a “determination” in timely fashion and, if not, the consequences of that *216 failure. Second is whether the Commission ever made a “determination” with respect to the Church’s application for a certificate of hardship and, if not, the consequences of that failure. Finally, assuming no procedural irregularities in the Commission’s doings, whether the Commission’s rejection of the application on the merits is consistent with the requirements of applicable law.
Treating the first question first, the Commission clearly made a “determination” within sixty days of the time the Church filed its application. In fact, it made that “determination” on May 17, the night the public hearing on the application was held. Words used in statutes, regulations and by-laws are to be given their plain and ordinary meaning. E.g., Commissioner of Revenue v. Amiwoodbroke, Inc., 418 Mass. 92, 94 (1994); Bay State Gas Company v. Local 273, Utility Workers Union of America, 415 Mass. 72, 75-76 (1993). A “determination” is a “judicial decision settling and ending a controversy . . . the act of deciding definitely and firmly.” Webster’s 9th New Collegiate Dictionary 346 (Mirriam-Webster 1985). Surely, the Commission’s vote at the conclusion of the May 17 meeting was its “determination.”
The question then becomes whether the Commission complied with the statutory notice and filing provisions. Those are found in §§10(a) and 10(f) of the governing statute, G.L.c. 40C, and of the by-law. Section 10(a) of the by-law, in language that essentially tracks language of the cognate statutory section, provides that
[i]n the case of a disapproval [of an application for a certificate of appropriateness], the commission shall place upon its records the reasons for such determination and shall forthwith cause a notice of its determination, accompanied by a copy of the reasons therefore as set forth in its records, to be issued to the applicant. . .
Section 10(f) of the by-law, again in language that essentially tracks that of the cognate statute, provides that “(t]he Commission shall file with the Town Clerk ... a copy or notice of all certificates and determinations of disapproval issued by it.”
Here, quite clearly, the Commission gave Church representatives notice of its determination forthwith. As stated the Commission voted at the conclusion of the hearing. Various members of the Commission stated their reasons for voting before the vote was taken. Representatives of the Church were in attendance to hear both the vote and the reasons. As they walked out of the meeting hall that night, Church representatives thus knew precisely what the Commission had done and why.
It is abundantly clear, therefore, that the Commission “acted” within the requisite time. It is equally clear, however, that the Commission’s written findings were not filed with the Town Clerk until four months after the May 17 hearing and four and one-half months after the Church filed the amended application seeking permission to add the vinyl siding. Notwithstanding its actual and timely notice of what the Commission had done and why, the Church argues that the passage of time between the date on which it filed its amended application and the date the Commission findings were filed with the Town Clerk constructively granted the Church’s application. The Church bases that argument on the 60-day time limit for Commission “action” found in §12 of the by-law and on cases construing what it claims are analogous provisions of the Zoning Enabling Act, G.L.c. 40A. Because I do not believe that the text of the by-law supports the conclusion the Church urges and because I do not believe that the cited provisions of c. 40A are analogous, I disagree.
A statutory scheme, of course, is to be construed as a whole and in a manner designed to effect the Legislature’s probable intent. E.g., McNeil v. Comm’r of Correction, 417 Mass. 818, 821-22 (1994). In carrying out the Legislature’s intent, Courts frequently differentiate between mandatory statutory provisions and those that are merely directory. Compliance with mandatory terms is a prerequisite to valid administrative action but compliance with directory terms, although desirable, is not essential.
Here, the mandatory language of the by-law and of the statute requires the Commission to “make a determination on the application” within 60 days. G.L.c. 40C, §11; By-law §12. Neither the statute nor the by-law requires that the determination be in writing and the requirement for a writing may not be lightly inferred.
Chapter 40C, §10(f) and By-law §10(f) require the Commission to file with the Town Clerk “a copy or notice of all certificates and determinations of disapproval issued by it.” Although that filing starts the time within which administrative or judicial reviewmustbe sought, see G.L.c. 40C, §§12, 12A, By-law§13, neither the statute nor the by-law specifies the time within which the Commission must make the filing with the Town Clerk. Because the Legislature did not specify a date by which the Commission is required to file its “determinations of disapproval,” this Court is not empowered to supply one. Prudential Ins. Co. v. City of Boston, 369 Mass. 542, 547 (1976); Mantoni v. Board of Appeals of Harwich, 34 Mass.App.Ct. 273, 275-76 (1993).
Both sides have pointed to a series of cases decided by the Supreme Judicial and Appeals Courts dealing with the superficially similar provisions of the zoning statute, G.L.c. 40A, §15, as appearing in St. 1975, c. 808, §3. E.g., Capone v. Zoning Board of Appeals of Fitchburg, 389 Mass. 617, 621-24 (1983); Zuckerman v. Zoning Board of Appeals of Greenfield, 394 Mass. 663, 665-67 (1985); O’Kane v. Board of Appeals of Hingham, 20 Mass.App.Ct. 162, 163-65 (1985); Demello v. Board of Appeals of Acushnet, 21 *217 Mass.App.Ct. 974, 975 (1986) (rescript). Read together, those cases hold, in essence, that, under a statute requiring a Board of Appeals to “act” within seventy-five days of the time an application is filed and to “file” “within fourteen days” “a detailed record of its proceedings . . . setting forth clearly the reason or reasons for its decision,” a Board of Appeals is required both to act and to file its decision no later than eighty-nine days after an application is filed. Under the express terms of the statute, failure to do either results in a constructive grant of the application.
As interpreted by the appellate courts, the statutory scheme embodied in §15 is designed to provide reasonably certain limits on the time the Board is required both to act and to file so that landowners and all other interested persons will know when the time to appeal begins and so that no permanent clouds can be established on a landowner’s right to use his or her property in a manner the law permits.[7]
Here, as stated, the governing statute is different for it requires action within 60 days after an application is filed but sets no deadline for filing.[8] Although inferentially the Legislature’s intent may have been similar to the intent it had when approving c. 40A, § 15, that intent was not expressed in c. 40C, §§12,12Awith precision sufficient to command the same result.[9] A statutory provision essentially granting applications by default runs counter to the general presumption that the government cannot be estopped by the acts or omissions of its agents. The Risk management Foundation of the Harvard Medical Institutions v. Commissioner of Insurance, 407 Mass. 498, 509-10 (1990). Courts therefore should not impose remedies of that type in the absence of clear statutory language providing for its imposition. As a consequence, I am of the opinion that the constructive grant provisions of G.L.c. 40C, §11 are triggered only by the Commission’s failure to make a determination on an application within sixty days of the date the application is filed. The Commissions failure to file a “determination of disapproval” within that period does not require the same result.
To be sure, construing the statute in the foregoing fashion may create uncertainty or other problems if the Commission makes a determination but then engages in a protracted period of delay before filing. Mandamus in particular and legislative changes more generally are appropriate remedies for those potential problems. Here, of course, the Church knew about the decision as soon as the decision was made and the record contains no suggestion that it was in any way prejudiced by the delay in filing or that it took any steps to urge an earlier filing.
The second question the Church raises is whether the Commission adequately dealt with its “hardship” petition. I have found that, under all of the circumstances revealed by the record, the Commission acted on, and denied, both the application for a certificate of appropriateness and the application for a certificate of hardship on May 17, 1994 and that both the Church and the Commission believed that that is what the Commission had done. Perhaps even more important, I find that there was nothing before the Commission that would have permitted the Commission to grant the certificate of hardship. There is no evidence in the present record that the Commission was told about any capital cost difference between installation of vinyl siding and installation of wood clapboard. To be sure, the Commission was told about painting costs but, insofar as the record of this action is concerned, those painting costs amounted to around $2,200 about every five years. Even taking into account the fact that the Church is a nonprofit organization and that its entire capital restoration budget was to be exhausted by the contemplated renovations, there is no suggestion that the Church would have had difficulty raising $2,200 every five years to repaint the building. Under all of those circumstances, the Commission simply would not have been warranted in granting a certificate of hardship had that been the sole matter presented to it for a decision. See Sleeper v. Old King’s Highway Historic District, 11 Mass.App.Ct. 571, 575 (1981).[10]
Turning, then to the merits, I am of the opinion that the Commission’s decision, while clearly not the only decision it was empowered to make, was neither arbitrary nor capricious nor in any other way beyond the scope of its jurisdiction. The record reveals that there is a debate in what might be called the “preservation community” about the appropriateness of using vinyl siding on historic buildings. The debate concerns both aesthetics and structural integrity. Each side has its proponents, each side has its opponents and, objectively viewed, each side has some merit. That set of circumstances, however, illustrates precisely why agencies like the Commission exist. If a course of action, or a position, is fairly debatable in general or as applied to a specific set of circumstances, then it is for the Commission, not the Court, to select the proper course. Anderson v. Old King's Highway Regional Historic Comm’n, 397 Mass. 609, 611 (1986); Grimley v. Board of Selectmen of Nantucket, 371 Mass. 718, 723-24 (1977). Here the Commission’s decision was well within the area within which it was permitted to act.
The Church argues that the Commission’s order runs afoul of Section 7 of the by-law which, as quoted above, provides in pertinent part as follows:
[T]he the use of any particular material shall not be prohibited based upon its composition alone. It is not the intent of this by-law to require that buildings and structures in the historic district be maintained as historic artifacts. Rather, the commission is required to apply the standards set forth herein ... in order to protect and preserve the general *218 flavor, and the distinctive characteristics and architecture of the historic district.
But, on this record, the Commission did not prohibit use of vinyl siding based on the siding’s composition. Instead, the Commission prohibited use of vinyl because of vinyl’s impact, visual and structural, actual and potential, on the Parish House. Section 7 only prohibits a Commission decision banning a particular material because of that material’s intrinsic characteristics. It does not prohibit the Commission’s consideration of the visual and structural impact a given material may have on an historic building.
Finally, the fact that a substantial percentage of the buildings in the Historic District had been covered with vinyl or other artificial siding before Edgartown adopted the by-law does not mean that the Commission’s decision to prohibit the Church from joining the vinyl-clad ranks was arbitrary or capricious. A contrary conclusion would mean that once modern alterations in a given area reached a critical mass, a town thereafter would be powerless to stop that feature’s proliferation regardless of its impact on the town’s historic character. In many cases, however, a town designates an historic district and triggers application of the provisions of c. 40C as a direct and preserving reaction to erosion of the district’s historic character. Accordingly, the Commission’s decision here was well within its power notwithstanding the amount of vinyl siding one can find in the Historic District today.
I recognize that upholding the Commission’s decision and requiring removal of the siding the Church has installed may well result in a financial hardship felt more severely because the Church is a charitable institution dependent on contributions for its existence.[11] Nevertheless, any wounding impact of the order is essentially self-inflicted. To resort to self-help always carries with it the possibility that the chosen course will prove to be wrong and will require undoing. That is precisely what has happened here.
ORDER
In light of the foregoing, it is hereby ORDERED that judgment enter
1. Dismissing the complaint of Plaintiff, Federated Church; and
2. On the counterclaim, ordering the Plaintiff, Federated Church, to file with the Defendant, Historic Commission for the Town of Edgartown, no later than September 1, 1995, a plan for removal of the vinyl siding on the exterior of the parish House and for replacement of that siding with clapboard or other material reasonably acceptable to the Commission no later than December 31, 1995.

In an effort to assist those who are contemplating repairs and renovations, the Commission has promulgated an informational flyer titled “Guidelines to the Edgartown Historic District By-Law.” In relevant part, those “Guidelines” state as follows:
ARCHITECTURAL STYLE “An Eclectic Community”
The Historic District contains buildings ranging in style from Early English through Log Cabin, early and late Colonial, Georgian, Federal, Greek Revival, Gothic Revival, various Victorian interpretations of Empire and other styles, turn-of-the century Store Front, Queen Anne, Hansel and Gretal Black Forest and some pre- and post-war 'Ranch Modern.
This “mixed-bag” is the result of tastes, economic status and interests of past generations. We are not and never have been a Williamsburg.
It is the objective of the [Commission] to encourage, within reason, the preservation of the mix which is a visual history of the town. (Do not convert a 1910 storefront in appearance to an 18th century residential facade. Do not install modern “bubble” skylights, glass sliding doors, large modern doors or picture windows, or unsightly antennas to buildings which never had such features. Do not replace a classical white wooden picket fence with a chain link or wire fence.)
MATERIALS
Whenever possible, within the context of modern fire and safety codes, use materials which are true to those used in the period within which the structure was built. The modern plastic and metal building materials are often the bane of the appearance of historic buildings, but they can be used in a manner which is unobtrusive.
Trial Exhibit 2.

Obviously, agents of the Church made the application and did all of the other acts attributed to “the Church” in the following discussion. Because there is no question about the authority of those agents to act on behalf of the Church, I simply refer to the “the Church” as the actor throughout.

Two individuals who voted on the application had some affiliation with the Church or with this project. Terrance Donahue, who voted against the Church’s application, had been an unsuccessful bidder on the proposed renovations. He prepared his bid based on an understanding that wood would be used to replace the clapboard on all four sides. There is no suggestion anywhere in the record, however, that Mr. Donahue’s bid was open at any time that the Church’s application was pending before the Commission or that the likelihood of Mr. Donahue’s future work for the Church was likely to be advanced or retarded in any way whatsoever by the Commission’s action on the Church’s application. Mrs. Campbell, who voted in favor of the Church’s application, was herself a member of the Church. The attributes of membership, however, were not detailed at the hearing and I therefore make no findings about what Mrs. Campbell’s “membership” in the Church involved. On the present state of the record, therefore, I am not persuaded, and therefore do not find, that participation of Mr. Donahue or of Mrs. Campbell in the May 17 hearing and vote was contrary to law. See G.L.c. 268A, §§ 17-20. Moreover, even if their participation was contrary to law, the requirements for vitiating the Commission’s action have not been met. See G.L.c. 268A, §21. Their votes on the application had the effect of cancelling each other out thus the result would have been the same even if they had not participated.

No one contends that the building inspector’s issuance of the license permits any conduct that the Commission has properly prohibited.

In pertinent part, regulations governing the Historic District provide that
the words ‘exterior architectural feature’ shall mean such portion of the exterior of the building or structure as is open to view from a public street. . .
Regulation, §4. When that definition is read in conjunction with §5 of the Regulations, see pages 2-3, supra, it is clear *219 that the Commission’s jurisdiction is limited to those portions of buildings that are visible from public streets.

The United States Department of the Interior has policies that discourage use ofvinyl siding to cover wooden buildings. See Trial Exhibit 11.

Even operating within that broad statutory scheme, however, the Courts made it clear that the filing provisions were directory, and not mandatory, as long as the Board’s decision was actually filed no later than eighty-nine days after the application had been filed. O’Kane v. Board of Appeals of Hingham, 20 Mass.App.Ct. 162, 164 & n.4 (1985).

The sixty day period set out in the statute clearly is the time within which the Commission must act, not file. See generally O'Kane v. Board of Appeals of Hingham, 20 Mass.App.Ct. 162, 164 (1985).

General judicial reluctance to supply “missing” statutory provisions is heightened in this case by changes the legislature made to G.L.c. 40A, §15 after the cited decisions were rendered. St. 1987, c. 498, §3. Under the amended statute, those claiming to have received a permit through administrative inaction must give notice of their claim within a prescribed period. Whether failure to comply with that notice provision is fatal to the permit claim, whether the notice provisions also apply to claims of constructive grant through an agency’s failure to file in timely fashion the record of a timely determination and whether the 1987 amendments alter the courts’ view that the filing deadlines are in some senses mandatory are all unanswered questions. The 1987 notice provisions and the questions those provisions spawned, however, illustrate the hazardous nature of attempting to fill perceived legislative “gaps” even in what appear to be simple “housekeeping” provisions drawing inferences about the Legislature’s probable intent.

I assume that notwithstanding the similarity between the “hardship” language appearing in G.L.c. 40C,§10(c) and G.L.c. 40A, §10, the almost impossibly onerous standards for hardship the latter statute embodies, see, e.g., Guiragossian v. Board of Appeals of Watertown, 21 Mass.App.Ct. Ill, 115-20 (1985), are somewhat relaxed when a hardship certificate is sought under c. 40C. But cf. Sleeper v. Old King’s Highway Historic District, 11 Mass.App.Ct. 571, 574 n.3 (1981).

I have taken the possible need to raise contributions into account in the timetable set out in §2 of the Order with which this Opinion concludes.